The DOW CHEMICAL COMPANY, Dowelanco n/k/a Dow Agrosciences LLC, Eli Lilly & Company Rofan Services, Inc. and Epco, Inc., Appellants–Defendants,

Louisville Chemical Company, Inc., Appellant–Defendant,

Affordable Pest Control, Inc., Appellant–Defendant,

v.

Todd EBLING and Cynthia Ebling, individually and Husband and Wife, and as Parents of Christina Ebling and Alex Ebling, Appellees–Plaintiffs.

No. 22A05–9812–CV–625.

Court of Appeals of Indiana.

Feb. 3, 2000.

Janet Barbre Norton, Dow AgroSciences, LLC, Stanley C. Fickle, Robert D. MacGill, Dean T. Barnhard, Joseph G. Eaton, William E. Padgett, Barnes & Thornburg, Indianapolis, Indiana, Attorneys for Appellant, The Dow Chemical Company, Dowelanco n/k/a Dow AgroSciences LLC, Eli Lilly & Company, Rofan Services, Inc., and Epco, Inc..

John W. Bilby, Henry S. Alford, Middleton & Reutlinger, Jeffersonville, Indiana, Attorneys for Appellant, Louisville Chemical Company, Inc.

Gene F. Zipperle, Jr., Crafton, Martin & Zipperle, PLLC, Louisville, Kentucky, Attorney for Appellant, Affordable Pest Control, Inc.

Roger L. Pardieck, Esq., Pardieck, Gill, Vargo & MacTavish, Seymour, Indiana, Janet O. Vargo, Esq., Pardieck, Gill, Vargo & MacTavish, Carmel, Indiana, Attorneys for Appellees.

## OPINION

DARDEN, Judge

### STATEMENT OF THE CASE

Todd and Cynthia Ebling, individually, as husband and wife, and as parents and natural guardians of Christina Ebling and Alex Ebling, (collectively, "the Eblings") filed various state tort claims against The Dow Chemical Company, DowElanco n/k/a Dow AgroSciences LLC, Eli Lilly & Company, Rofan Services, Inc. and Epco, Inc. (collectively, "DowElanco"), Louisville Chemical Company ("LCC"), Affordable Pest Control ("Affordable"), and others. The Eblings generally allege that Christina and Alex developed seizure disorders and other health conditions as a result of their exposure to pesticides— Dursban 2E and Dursban L.O., products manufactured by DowElanco and allegedly applied to the Eblings' apartment by Affordable; and Creal–O, a product formulated by LCC. In this consolidated appeal, DowElanco, LCC and Affordable appeal from the denial of their separate motions for summary judgment.[1]

We affirm in part and reverse in part and remand.

### ISSUES

DowElanco, LLC, and Affordable raise numerous issues on appeal, which we consolidate and restate as follows:

I. Whether the Eblings' state law tort claims against DowElanco, LCC, and Affordable are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).

II. Whether Affordable is entitled to summary judgment on the Eblings' strict liability and negligence claims brought under the Indiana Product Liability Act on the grounds that the pest control rendered by Affordable involved wholly or predominately the sale of a service rather than a product.

III. Whether a genuine issue of material fact exists as to whether Affordable breached a standard of care in applying Dursban in the Ebling apartment.

IV. Whether Affordable's application of Dursban constitutes an abnormally dangerous activity warranting the application of strict liability for the resulting harm to the Eblings.

V. Whether a genuine issue of material fact exists as to whether Affordable's conduct of applying Dursban in the Ebling apartment gives rise to punitive damages.

1. Oral argument was held on September 13, 1999.

## FACTS

### DowElanco and Dursban Pesticides

DowElanco, now known as Dow AgroSciences LLC, began as a joint venture between defendant Rofan Services, Inc.[2] and Epco, Inc.[3] to develop, manufacture and market agricultural and specialty products. Before October of 1989, Dow developed, manufactured and marketed a group of insecticides under the trademark Dursban. Dursban L.O. and Dursban 2E are two of those insecticides. Dursban 2E and Dursban L.O. were registered with the Environmental Protection Agency (EPA) in 1982 and 1984, respectively. As a part of the registration process, Dow received from the EPA stamped and accepted labels for both insecticides, which were authorized by the EPA for use in and around residential structures, including apartments and apartment complexes. In 1989, the registrations of Dursban 2E and L.O. were transferred to DowElanco.

DowElanco does not sell Dursban 2E or L.O. to the general public. Instead, DowElanco sells Dursban 2E and L.O. products with the EPA-approved labels affixed thereto to professional applicators, distributors and formulators who repackage the products. There is no evidence that DowElanco gave any end-consumers EPA-approved labeling information regarding the dangers of its pesticides or directed any applicators, distributors or formulators to do so.

An active ingredient in Dursban products is chlorpyrifos. In November of 1994, DowElanco voluntarily submitted to the EPA reports of allegations of adverse effects resulting from exposure to pesticide products containing chlorpyrifos as an active ingredient. The EPA subsequently brought a civil administrative action against DowElanco, alleging in part that DowElanco had violated FIFRA by not timely submitting to the EPA hundreds of incident reports concerning the alleged adverse effects of its pesticide products on humans or the environment. In the summer of 1995, DowElanco entered into a consent agreement with the EPA and paid a civil penalty of $876,000. Despite the imposition of this civil penalty, the EPA did not withdraw or alter DowElanco's registrations for Dursban L.O. and 2E.

### LCC and Creal–O Pesticide

At all relevant times, LCC was a formulator of a ready-to-use pesticide known as Creal–O. As a formulator, LCC would mix mineral spirits with three active ingredients—diazinon, pyrethrins, and piperonyl butoxide. In 1974, as a part of the registration process for Creal–O, LCC was permitted by the EPA to adopt and incorporate the safety and toxicological data submitted by the manufacturers of Creal–O's active and inert ingredients. The EPA registered Creal–O and authorized its use in and around residential structures, including apartments and apartment complexes. LCC received from the EPA a stamped and accepted product label for Creal–O, which states as follows:

> Avoid contact with skin, eyes or clothing. In case of spillage on skin, wash thoroughly with water and soap. Harmful if swallowed. Wash hands, arms, and face with soap and water after handling and before eating or smoking. Avoid inhalation of vapor or spray.

(R. 35).

### Application of the Pesticides and the Eblings

In April of 1993, Prestwick Square Apartments entered into a pest control service agreement with Affordable, a professional applicator. Under the service agreement, Affordable was to provide regular pest control for roaches, ants, silverfish, mice and rats. In exchange, Prestwick Square paid Affordable for pest control treatments on a per apartment unit basis. The service agreement did

---

2. Rofan is a wholly owned subsidiary of Dow Chemical Company.

3. Epco is a wholly owned subsidiary of Eli Lilly and Company.

not specify the type or brand of pesticide to be applied in the apartments.[4] The term of the service agreement was for six months; afterwards, the agreement was to be automatically renewed month to month until canceled by written notice. Affordable sprayed Dursban[5] in the apartment units in Prestwick Square on a preventive basis. In April of 1994, Prestwick Square canceled its service agreement with Affordable and began using its own maintenance personnel to apply Creal–O, a ready-to-use pesticide.

Shortly after the Eblings moved into their apartment unit at Prestwick Square in February of 1994, three-year-old Christina and five-month-old Alex began experiencing seizures and other health problems. In October of 1994, Alex had to be hospitalized for the uncontrollable seizures. Christina experienced uncontrollable seizure in December of 1994.

Affordable did not provide Prestwick Square or the Eblings with any of Dursban's EPA-approved warnings and labeling information. Further, although Louisville Chemical provided Prestwick Square with the EPA-approved labeling for Creal–O, the Eblings were not provided with this labeling before their exposure to that pesticide.

In late January of 1995, after the Eblings had moved out of their apartment in Prestwick Square, investigators for the Indiana State Chemist took swab samples from various areas of the apartment to determine the types and levels of pesticide residues. The lab report showed the presence of Chlorpyrifos from Dursban. The Eblings' clothing and toys tested in 1997 three years after the Eblings were allegedly last exposed to Dursban and Creal–O, still revealed the presence of Chlorpyrifos and Diazinon.

### DISCUSSION AND DECISION

### I. Preemption—Eblings v. DowElanco, LLC, and Affordable

#### Preemption Doctrine

■ The preemption doctrine is grounded upon the Supremacy Clause of Article Six of the United States Constitution, which invalidates those state laws that interfere with, or are contrary to federal law. U.S. Const. Art. VI, Cl. 2; *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 2374, 85 L.Ed.2d 714 (1985). The United States Supreme Court explained the different forms of preemption in its opinion in *Louisiana Public Service Com'n v. F.C.C.*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):

> The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

476 U.S. at 368–69, 106 S.Ct. at 1898 (citations omitted). "The critical question in

---

4. The contract merely provided that "[t]he materials used in pest control work shall conform to all Federal, State and local ordinances and laws." (R. 736).

5. Although the Eblings originally alleged that Dursban L.O. and/or Dursban 2E were applied in their apartment, their discovery responses reveal that Dursban 2E was the only Dursban pesticide applied to their apartment. Because the parties do not suggest that there is any significant difference between the two pesticides for purposes of this appeal, we hereinafter refer to the pesticides collectively as "Dursban."

any preemption analysis is always whether Congress intended that federal regulation supersede state law." *Id.* at 369, 106 S.Ct. at 1899. As explained in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992):

> Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. In the absence of an express congressional command, state law is pre-empted if the law actually conflicts with federal law, or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.

*Id.* at 516, 112 S.Ct. at 2617 (quotations and citations omitted).

▇▇▇ When considering preemption, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S.Ct. 2476, 2483, 115 L.Ed.2d 532 (1991). Our analysis of the scope of the statute's preemption is also guided by the principle that "[t]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 2240, 135 L.Ed.2d 700 (1996). Accordingly, any understanding of the scope of a preemption statute must rest primarily on "a fair understanding of *congressional purpose*," as discerned from the language of the preemption statute and the " 'statutory framework' surrounding it." *Id.* (emphasis in original) (citations and quotations omitted). Also relevant to the analysis is the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (quotation omitted).

## FIFRA Requirements

Our analysis of the preemptive scope of FIFRA necessarily begins with a consideration of the requirements of FIFRA and the goals that it is intended to achieve. In 1947, Congress enacted FIFRA to replace its first attempt at federal pesticide regulation, the Insecticide Act of 1910. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 2866 n. 2, 81 L.Ed.2d 815 (1984). As first enacted, FIFRA was primarily a licensing and labeling statute designed to work in harmony with the Uniform State Insecticide, Fungicide and Rodenticide Act which had been adopted in many states. *Id.*; S.Rep. No. 02–838, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 3993, 3999. In 1972, Congress undertook a comprehensive revision of FIFRA through the adoption of the Federal Environmental Pesticide Control Act primarily due to the mounting public concern about the safety of pesticides and their effect on the environment and the growing perception that the existing legislation was not equal to the task of safeguarding the public interest. *Ruckelshaus*, 467 U.S. at 991, 104 S.Ct. at 2867. The 1972 amendments transformed FIFRA from a labeling law into a comprehensive regulatory statute governing the use, sale and labeling of pesticides. *Id.*; see 7 U.S.C. §§ 136–136y. The amendments further granted increased enforcement authority to the EPA, which had been charged with the oversight of pesticides since 1970. *Mortier*, 501 U.S. at 601–602, 111 S.Ct. at 2479–2480.

Today, pesticides such as Dursban and Creal–O sold or distributed in the United States must be registered with the EPA in accordance with the requirements of FIFRA and its associated regulations. *See* 7 U.S.C. § 136a(a), (c). The purpose of the registration process is to prevent unreasonable adverse effects on the environment, which includes not only land, air and water, but also humans and animals. 7 U.S.C. § 136a(a).

FIFRA establishes a complex process of EPA review to attain the approval of the label under which the product is to be marketed. *See* 7 U.S.C. § 136a(c). To register a pesticide, a manufacturer must submit the pesticide's name, its labeling information, directions for its use, its formula, information concerning studies of the product, and its adverse effects. 7 U.S.C. § 136a(c); *see also* 40 C.F.R. 152.50 & 153. The EPA is then charged with the duty of determining what supporting data the manufacturer must provide concerning the pesticide. *See* 40 C.F.R. § 158.190. The EPA then registers the pesticide if it determines that its composition warrants the proposed claims for it, that its labeling complies with FIFRA requirements, and that it will perform its intended function without unreasonable adverse effects on the environment. 7 U.S.C. § 1365(c)(5). At the time of registration, the manufacturer is required to submit a proposed label to the EPA for approval, and the EPA must ensure that the proposed label is both "adequate to protect health and the environment" and "likely to be read and understood." 7 U.S.C. § 136(q)(1)(F). To this end, EPA regulations provide specific labeling requirements governing the content of labels and the placement of labels. 40 C.F.R. 156.10(a)(1) & (3). In addition, the regulations provide specific requirements regarding content, placement, type size and prominence of the warning and precautionary statements on labels. § 156.10(h). These warnings and precautionary statements concern the toxicological hazards of the registered pesticide, including "hazard to children, environmental hazard, and physical or chemical hazard." *Id.*[6] After the product is registered, the manufacturer generally is not free to modify the labeling approved by the EPA without EPA approval, 7 U.S.C. § 136a(2)(A), and must report new information on unreasonable adverse effects of the pesticide

on the environment to the EPA. *See* 40 C.F.R. § 152.125.

In the 1972 amendments, Congress added the preemption provision at issue, which provides as follows:

(a) In general

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v.

*History of Case Law Interpreting FIFRA*

Prior to *Cipollone, supra.*, both federal and state courts were divided over the issue of whether § 136v(b) preempts state tort claims premised upon inadequate labeling and failure to provide adequate warnings. In *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. den.* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), the first federal appeals court to address FIFRA preemption, the court considered whether the plaintiff's state law claim that he had been injured by exposure to paraquat, a herbicide distributed by Chevron, was preempted by FIFRA. Relying on § 136v(a), *Ferebee* said, "While FIFRA does not allow states directly to impose additional labeling requirements, the Act clearly allows states to impose more stringent constraints on the use of EPA-approved pesticides than those imposed by the EPA." *Id.* at 1541. Thus, according to *Ferebee*, a state may restrict the use of a pesticide by requiring that the manufacturer compensate for injuries re-

---

**6.** Registered pesticides are grouped into four human toxicity categories based on the following hazard indicators: oral, inhalation, dermal toxicity and the effects of pesticide contact with eyes and skin. *See* 40 C.F.R. 156.10(h)(1). The text of the warning on the front panel of the label is determined by the pesticide's toxicity category. *Id.*

sulting from use of a pesticide. *Id.* The court held that § 136v(b) neither expressly nor implicitly preempted state tort actions for damages based on inadequacy of an EPA-approved label. *Id.* at 1542. The court reasoned that Congress has not explicitly preempted state damage actions; that compliance with both federal and state law cannot be said to be impossible; and that the plaintiff's state damages action did not stand as an obstacle to the accomplishment of FIFRA's purposes. *Id.*

Although numerous federal district courts initially accepted *Ferebee's* preemption analysis and concluded that FIFRA neither expressly nor impliedly preempts state tort claims based upon failure to warn, the two subsequent federal appellate courts addressing the preemptive scope of FIFRA rejected *Ferebee's* approach and held that FIFRA impliedly preempts state damages actions which challenge the adequacy of EPA-approved pesticide labels. *See Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991) *("Papas I")* and *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.,* 959 F.2d 158 (10th Cir.1992) *("Arkansas–Platte I").*

In 1992, the United States Supreme Court in *Cipollone* provided an extensive preemption analysis of a federal statute similar to the preemptive provision in FIFRA. In that case, a victim of lung cancer and her spouse brought a lawsuit against cigarette manufacturers, alleging that the companies had breached express warranties contained in their advertising, that they failed to warn consumers of the hazards of smoking, that they fraudulently misrepresented those hazards to consumers, and that they conspired to deprive the public of medical information about smoking. 505 U.S. at 508, 112 S.Ct. at 2613. The Federal Cigarette Labeling and Advertising Act of 1965 (1965 Act) and its successor, the Public Health Cigarette Smoking Act of 1969 (1969 Act), required a warning of the hazards of smoking on all packages of cigarettes sold. The 1965 Act

contained the following preemption provisions:

 (a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.

 (b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

505 U.S. at 514, 112 S.Ct. at 2616. Subsection (b) was amended by the 1969 Act to read as follows: "No *requirement or prohibition based on* smoking and health shall be *imposed under State law with respect to* the advertising *or promotion* of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." 505 U.S. at 515, 112 S.Ct. at 2616 (emphasis added). The issue presented in *Cipollone* was whether these provisions preempted a state from awarding damages on the plaintiff's common law tort claims. 505 U.S. at 508, 112 S.Ct. at 2613.

In discerning the preemptive scope of the Acts, the Court found no reason to look beyond the express language in the preemption provisions:

When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' 'there is no need to infer congressional intent to preempt state laws from the substantive provisions' of the legislation.... Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

*Id.* at 517, 112 S.Ct. at 2618. Accordingly, the Court determined that it "need only identify the domain expressly pre-empted" by the preemption provisions in the 1965 and 1969 Acts. *Id.*

In regards to the 1965 Act, the Court focused on the language, "No *statement* relating to smoking and health," and held that the 1965 preemption provision did not preempt state damage actions but "merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements" on cigarette labels and in cigarette advertisements. *Id.* at 518, 112 S.Ct. at 2618 (emphasis added). In support of its conclusion, the Court emphasized that "there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damage actions." *Id.*

The Court, however, held that the broader preemptive language in the 1969 Act did preempt some of the plaintiffs' claims. Rather than barring "statements," the provision in the 1969 Act barred "requirements and prohibitions." *Id.* at 520, 112 S.Ct. at 2619. Also, the 1969 Act "reache[d] beyond statements 'in the advertising' to obligations 'with respect to the advertising or promotion' of cigarettes.'" *Id.* The Court noted that the phrase "'[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." *Id.* at 521, 112 S.Ct. at 2620.

The Court then held that the 1969 Act preempted state tort actions for failure to warn insofar as they claimed that advertisements "should have included additional, or more clearly stated, warnings." *Id.* at 524, 112 S.Ct. at 2621. The Court also ruled that claims for fraudulent misrepresentation—based on the theory that statements in promotional materials minimizing the health risks—undercut the required health warnings. *Id.* at 524–25, 527–28, 112 S.Ct. at 2622–23. By contrast, the Court found that claims for breach of express warranties were not preempted, reasoning that the warranties were a duty created by the cigarette companies, not

state law. *Id.* at 526–27, 112 S.Ct. at 2622–23. The Court also found that conspiracy claims and fraudulent misrepresentation claims based on intentional concealment of information through channels other than advertising were not preempted. *Id.* at 30–31, 112 S.Ct. at 2624–25.

■ Shortly after its decision in *Cipollone,* the Supreme Court indicated that the preemption analysis in that case should also be applied to FIFRA preemption determinations when it vacated two federal circuit court judgments holding that FIFRA impliedly preempted state common law failure to warn claims and remanded for reconsideration in light of *Cipollone.* See *Papas v. Zoecon Corp.,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992) (vacating & remanding *Papas I* ) and *Arkansas–Platte & Gulf Partnership v. Dow Chemical Co.,* 506 U.S. 910, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992) (vacating and remanding *Arkansas–Platte & Gulf Partnership I* ). On remand, both circuits held that FIFRA expressly preempts state failure to warn claims based on inadequate labeling. *Papas v. Upjohn Co.,* 985 F.2d 516, 518 (11th Cir.), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) ("*Papas II* "); *Arkansas–Platte & Gulf Partnership v. Van Waters, Inc.,* 981 F.2d 1177, 1179 (10th Cir.), *cert. denied,* 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993) ("*Arkansas–Platte II* "). Thereafter, all federal circuits which have addressed the issue have concluded that § 136v(b) expressly preempts state common law claims for damages that are based on an alleged failure to warn or convey information about a product through its EPA-approved labeling. *See, e.g., Kuiper v. American Cyanamid Co.,* 131 F.3d 656 (7th Cir.1997), *cert. denied.,* 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998); *Grenier v. Vermont Log Buildings, Inc.,* 96 F.3d 559 (1st Cir.1996); *Welchert v. American Cyanamid, Inc.,* 59 F.3d 69 (8th Cir.1995); *Taylor AG Indus. v. Pure–Gro,* 54 F.3d 555 (9th Cir.1995); *Bice v. Leslie's Poolmart,* 39 F.3d 887 (8th

Cir.1994); *MacDonald v. Monsanto Co.*, 27 F.3d 1021 (5th Cir.1994); *Worm v. American Cyanamid,* 5 F.3d 744 (4th Cir. 1993). An overwhelming majority of state supreme and appellate courts and federal district courts have agreed. In *Hottinger v. Trugreen Corp.*, 665 N.E.2d 593 (Ind.Ct. App.1996), this court summarily joined this rapidly expanding consensus.

## Preemptive Scope of FIFRA

■ We now look to *Cipollone* for guidance to determine the preemptive scope of FIFRA's preemption provision. Congress has considered the issue of federal preemption as it pertains to FIFRA and included in the enacted legislation a provision explicitly addressing that issue, and this provision "provides a reliable indicium of congressional intent with respect to state authority." *See Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618 (citation and internal quotation omitted). Accordingly, there is no need for this court to infer congressional intent to preempt state laws from the substantive provisions of FIFRA; we "need only identify the domain expressly pre-empted" by 136v. *See Id.*

■ We begin by noting that Congress did not intend to occupy the entire field of pesticide regulation. *Mortier*, 501 U.S. at 607, 111 S.Ct. at 2483. It is clear from § 136v(a) that Congress plainly intended to grant states the power to regulate "sale or use" of pesticides as long as the state regulation "does not permit any sale or use prohibited" by FIFRA. *Taylor AG Industries*, 54 F.3d at 561 (" § 136v(a) 'is a general grant of authority to the states to regulate the 'sale or use' of pesticides.' "). In fact, states retain significant authority to regulate pesticide use within their borders. *See Mortier*, 501 U.S. at 613, 111 S.Ct. at 2486 (holding FIFRA did not preempt local government authority to regulate pesticide use).

■ § 136v(b), the provision immediately following FIFRA's grant of regulatory authority to the states, is entitled "Unifor-

mity" and declares that "[s]uch State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required *under this subchapter.*" (emphasis added). Because the EPA has been granted the general authority to write regulations or requirements in the area of labeling and packaging to carry out the purpose of FIFRA, it is clear that the preemptive effect of FIFRA is dependent on EPA regulations. *Hawkins v. Leslie's Pool Mart, Inc.*, 184 F.3d 244, 248 (3rd Cir. 1999) (citing H.R.Rep. No. 92–511 at 1 and 7 U.S.C. § 136v(a), (b)).

■ We further note that the plain language of § 136v(b) does not preempt all state requirements in the area of labeling and packaging; instead, Congress has explicitly provided that only state labeling or packaging requirements *"in addition to or different from "* those required by FIFRA are prohibited. 136v(b); *see Lowe v. Sporicidin Intern.*, 47 F.3d 124, 128–29 (4th Cir.1995); *MacDonald v. Monsanto,* 27 F.3d 1021, 1024 (5th Cir.1994) ("FIFRA preempts conflicting state common law concerning the improper labeling of herbicides," but § 136v(b) "does not preempt ... those state laws concerned with herbicide labeling that do not impose any requirement 'in addition to or different from' the FIFRA requirements."). Concerned with uniformity among the states, Congress' clear purpose was to preempt only conflicting state law requirements concerning the labeling and packaging of pesticides. Had Congress intended otherwise, it could have simply stated that all requirements for labeling and packaging are preempted.

■ As a final point, we note that the phrase "any requirements" in § 136v(b), like the phrase "[n]o requirement or prohibition" in the 1969 Act addressed in *Cipollone*, is sufficiently expansive to include positive enactments of state lawmaking bodies as well as common law duties enforced in state tort actions for damages. This interpretation is consistent with the

majority of jurisdictions defining the plain meaning of "requirements" to include common law claims for damages. *See, e.g., Arkansas–Platte II,* 981 F.2d at 1179; *Papas II,* 985 F.2d at 518; *Worm,* 5 F.3d at 748–49; *Goodwin v. Bacon,* 127 Wash.2d 50, 896 P.2d 673, 679 (1995).

▬▬▬ We must therefore consider each of the Eblings' claims to determine whether it is in fact preempted by FIFRA in light of the presumption against preemption. The central inquiry as to each claim is straightforward: we ask whether the legal duty that is the predicate of the common law damages action constitutes a "requirement[ ] for labeling or packaging in addition to or different from" the EPA regulations. 7 U.S.C. § 136v(b); *Cipollone,* 505 U.S. at 524, 112 S.Ct. at 2621. Clearly, any direct challenge to the adequacy of warnings through EPA-approved labeling is preempted. We are also called upon to determine whether the Eblings' claims are merely another way of alleging that the warning on the labeling was inadequate. Such indirect challenges to EPA-approved labeling are also preempted.[7]

A. *Broader Label Dissemination Theory*

(1)

The Eblings have asserted state common law failure-to-warn claims against DowElanco and LCC premised on the fact that DowElanco and LCC failed to provide the Eblings with the EPA-approved labeling information for Dursban and Creal–O, respectively. In discussing how this duty might be accomplished, the Eblings contend that DowElanco "could have provided EPA-approved information to remote vendees by supplying the applicators with sufficient quantities of approved informa-

tion for distribution directly to the persons whose homes were to be sprayed."[8] (R. 715). As to LCC, the Eblings assert that "[LCC] should have provided copies of the approved Creal–O label and MSDS information to Prestwick residents or, at the very least, encourage Prestwick to pass along this information to its residents." Brief of Eblings, p. 4. Thus, the predicate duty underlying the Eblings' failure-to-warn claims would be a state common law duty imposed on pesticide registrants to provide additional copies of EPA-approved labeling information to purchasers/users (i.e., distributors and applicators) with instructions that these purchasers/users disseminate this labeling information to the end customers and/or bystanders who might be exposed to the pesticides.

▬▬▬ We find that the Eblings' failure to warn theory predicated on a registrant's duty to provide pesticide purchasers with sufficient quantities of written EPA-approved labeling information for "downstream" distribution does challenge the product's labeling; therefore, it is preempted. As noted above, FIFRA restricts state authority as to labeling or packaging. Specifically, § 136v(b) preempts the imposition of state requirements for labeling or packaging "in addition to or different from" EPA requirements. The term "label" is broadly defined by FIFRA as "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers." 7 U.S.C. 136(p). The term "labeling" includes "all labels and all other written, printed, or graphic matter—(A) accompanying the pesticide ... at any time;

---

7. In this part of the opinion, we express no opinion on whether any of the Eblings' claims are viable under Indiana law; we assume arguendo that they are.

8. The Eblings claim that Indiana law follows this extended duty to warn rational. In support of this contention, the Eblings direct us to *Natural Gas Odorizing, Inc. v. Downs,* 685 N.E.2d 155 (Ind.Ct.App.1997), *trans. denied,*

wherein a panel of this court concluded that under Indiana's Product Liability Act, "[a] manufacturer, seller or distributor of a product has a duty to warn those persons it should reasonably foresee would be likely to use its product or who are likely to come into contact with the danger inherent in the product's use." *Id.* at 162.

or (B) to which reference is made on the label or in literature accompanying the pesticide...." 7 U.S.C. § 136(p)(2). FIFRA's broad definition of labeling therefore includes all written matter accompanying the registered pesticide regardless of its contents. The labeling materials need not be affixed to the pesticide.

 Thus, any written information that a pesticide registrant disseminates with a pesticide is considered ·"labeling" under FIFRA, and any obligation placed upon a registrant in this regard is necessarily a labeling requirement. From this language, it is clear that Congress intended to preempt state common law actions that would impose requirements on a registrant to disseminate additional written matter with its product, regardless of whether this matter was identical to the EPA-approved labeling information.[9]

Therefore, any supplemental materials or instructions to end-users/applicators at a particular time would constitute "labeling" as the term is defined by FIFRA. In essence, the Eblings challenge the adequacy of the scope of the warnings on the Dursban and Creal–O labels. If the Eblings prevailed on their claims of failure to warn under such a theory, a state imposed labeling requirement not included in FIFRA would be established. This additional state regulation is precisely what Congress precluded.

Our conclusion is· consistent with the majority of cases in other jurisdictions which have generally concluded that FI-

FRA preempts failure to warn or convey information claims against pesticide manufacturers that are not directly based on the language on the pesticide label. For example, in *Papas II*, the plaintiffs urged the Eleventh Circuit to hold that their failure to warn claims "unrelated to labeling and packaging" are not pre-empted by § 136v(b). Specifically, the plaintiffs contended that "because the language of 136v[b] refers only to 'labeling or packaging,' the section does not preempt failure to warn claims based on point-of-sale signs, consumer notices, or other informational materials that are 'unrelated' to labeling and packaging." *Id.* at 519. In rejecting this argument, *Papas II* held that

> ... any claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging. *If a pesticide manufacturer places EPA-approved warnings on the label and packaging of its products, its duty to warn is satisfied, and the adequate warning issue ends.* Plaintiffs may not interfere with the FIFRA scheme by bringing a common law action alleging the inadequacy of, for example, point-of-sale signs. Because claims challenging the adequacy of warnings on materials other than the label or package of a product necessarily imply that the labeling and packaging failed to warn the user, we

---

**9.** In support of its argument that Congress did not intend to preempt their failure to warn. claim, the Eblings claim that the EPA regulations do not address the issue of who should be warned. We disagree. The structure of FIFRA clearly suggests that Congress intended pesticide labeling to be the primary vehicle of informing the *purchaser/user* of inherent dangers and limitations of pesticides. *See, e.g.,* 7 U.S.C. § 136a(c); *Grenier v. Vermont Log Bldgs., Inc.,* 96 F.3d 559, 564 (1st Cir.1996). The EPA regulations further indicate that pesticide labeling is designed to accompany the product through the stream of

commerce to the end user. *See Roberts v. Dow Chemical Co.,* 702 F.Supp. 195, 196 (N.D.Ill.1988) ("The basic purpose of the statute [is] to regulate the labeling of such products to provide purchasers with assurance of effectiveness and safety when used in compliance with the manufacturer's instruction."). Therefore, the EPA regulations not only contain specific requirements for the form and content of the labeling, but also contain specific requirements for what the registrant must do with that labeling. *See* 40 C.F.R. 156.10(a)(4).

conclude that these claims are also pre-empted by FIFRA.

*Id.* at 519 (emphasis added). Thereafter, in *Goodwin*, the Washington Supreme Court followed the reasoning of *Papas II*, in concluding that a plaintiff's claim against a manufacturer for failure to warn "through other channels, such as trade, sales, or advertisements" was preempted. 896 P.2d at 681. Other courts have reached similar results. *See Taylor AG Industries*, 54 F.3d at 561 ("[W]e hold that Appellants' claim for inadequate point-of-sale warnings is preempted because their claim is premised ultimately upon the inadequacy of the product label."); *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 886 P.2d 869 (1994), *cert. denied*, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Pitts v. Dow Chemical Co.*, 859 F.Supp. 543, 549 (M.D.Ala.1994).[10]

### (2)

■ The Eblings also asserted claims against LCC, alleging that LCC was negligent by failing to warn, instruct, and train the Prestwick Square employees (1) "to ventilate the apartments before and after spraying" and (2) "not to spray apartments when tenants were present." (R. 77). When asked to describe the warnings they contended should have accompanied the product, the Eblings simply responded that it was not their obligation to design and prepare an adequate warning for Creal-O. It is clear from this response that the Eblings' claims essentially challenge the adequacy of instructions and warnings contained in the EPA-approved Creal-O labeling. The legal duties sought to be imposed by the Eblings constitute requirements for labeling in addition to or different from those required by the EPA regulations, and therefore, are equally preempted by FIFRA. § 136v(b).

### (3)

■ The Eblings have also asserted a similar failure to warn claim against Affordable, the pesticide applicator who applied Dursban to the Ebling apartment. To the extent that the Eblings claim that Affordable had an obligation to warn them with respect to the potential adverse effects of applying the Dursban, these claims are likewise encompassed by FIFRA preemption. *See Wadlington v. Miles Inc.*, 922 S.W.2d 520 (Tenn.App.1995); *Bingham v. Terminix International Co., L.P.*, 896 F.Supp. 642 (S.D.Miss.1995).

### B. *Regulatory Non–Compliance*

■ The Eblings have also asserted a state law claim alleging negligence *per se* against DowElanco arising out of DowElanco's alleged violation of EPA regulations by failing to timely report adverse incident reports it had received regarding chlorpyrifos, the active ingredient in Dursban.[11] In its Interrogatory No. 26, DowElanco asked the Eblings to state "*each and every factual and/or legal basis* which [they] contend supports the allegation ... that negligence on the part of DowElanco 'was a proximate cause of injury and damages to the Eblings.'" (R. 109) (emphasis added). The Eblings objected to the interrogatory because it required a statement of each and every factual and/or legal basis of

---

10. In support of their argument that their failure to warn claim is not preempted, the Eblings rely primarily on *Macrie v. SDS Biotech Corp.*, 267 N.J.Super. 34, 630 A.2d 805 (1994), which held "[s]tate law may require a pesticide manufacturer to take reasonable steps, either through instructions to its customers or directly through its own efforts, to assure that persons, ... who handle produce bought directly from farmers who have used [a fungicide], will be warned of its dangers, at least by receiving defendant's brochures in the form prescribed by the E.P.A." 630 A.2d at 813. We find the court's reasoning in *Macrie* unpersuasive and contrary to the majority of FIFRA preemption case law addressing the issue of whether FIFRA preempts failure to warn claims that are not directly based on the language of the label.

11. The Eblings do not assert a private right of action under FIFRA based on DowElanco's alleged non-compliance with EPA regulations. Indeed, there is no dispute that no private right of action exists under FIFRA.

proximate cause before discovery was complete and before the Eblings' consultants had completed their evaluation of the case. The Eblings further objected to the interrogatory on the grounds that DowElanco's responses to their discovery requests were incomplete and evasive. Nevertheless, the Eblings provided DowElanco with a single causation theory concerning their regulatory noncompliance claim: that if DowElanco had more promptly reported to the EPA claims and allegations of adverse effects associated with exposure to Dursban, the EPA would have imposed *"major changes to the product labels,* to the material safety data sheets and other items" prior to the Eblings' exposure to Dursban. (R. 111) (emphasis added). In their response, the Eblings stated:

> [H]ad this information been provided to EPA, labels and warnings would have been placed on Dursban products which would have allowed end users to make *more informed decisions about Dursban* and Dursban would not have been applied at all in the Ebling apartment.

> * * *

> ... Plaintiffs intend to show how if EPA had been timely told of these incidents, major changes to the labels, to the material safety data sheets and other items would have been made prior to Plaintiffs' exposure to Dursban. Had these disclosures and the changes to collateral materials used in the sale of Dursban been made, plaintiffs believe Prestwick Apartments would not have permitted Dursban to have been applied in the Ebling apartment.

(R. 111).

Based on the theory of causation provided in the Eblings' response, DowElanco moved for summary judgment arguing in part that the Eblings' negligence per se claim premised on regulatory noncompliance was preempted by FIFRA. Specifically, they argued that "[b]ecause Plaintiffs' negligence claims are that the EPA would have made 'major changes' to Durs-

ban's warning labels had it been properly informed, Plaintiffs' claims are a preempted challenge to the legal sufficiency of the warnings and precautions on the products labels as they existed at the time of application of the products to the Plaintiffs' apartment." (R. 147). The trial court denied DowElanco's motion as to the Eblings' negligence claim predicated on a theory of alleged failure to report adverse incidents to the EPA.

On appeal, DowElanco claims that the Eblings' noncompliance theory is a disguised challenge to the legal sufficiency of the warnings on the EPA-approved product labeling. Thus, we must determine whether the Eblings' negligence per se claim based on a noncompliance theory is in fact synonymous with a failure to warn claim challenging the adequacy of the EPA-approved labeling.

In light of the Eblings' response to interrogatory No. 26, it seems quite clear that the nature of the Eblings' regulatory noncompliance claim as disclosed by the record is inextricably related to the adequacy of the warnings and precautions on the EPA-approved Dursban label. The Eblings stated theory in the proceedings below is premised on the fact that the EPA-labeling was insufficient and that "major changes" to the labeling would have been made if DowElanco had timely reported the adverse incident reports. The Eblings in essence would have to show that the information on the EPA-approved label was insufficient and a different label sufficient to protect the Eblings would have been drafted. Therefore, the Eblings' regulatory noncompliance claim is expressly preempted to the extent that it relies on a state-law "requirement[ ] for labeling ... in addition to or different from" those required by the EPA.

The Eblings appear to suggest that even if this noncompliance theory is FIFRA preempted, "[c]laims contending other steps—i.e., more testing, change in design, or providing the ultimate consumer with

the approved labeling—would have prevented the Plaintiffs' injuries would go forward in any event because they are not related to the label." Brief of Eblings, p. 25. DowElanco contends that the Eblings assert these causation theories for the first time on appeal. DowElanco further argues that these causation theories contradict the Eblings' response to Interrogatory No. 26.

We find that the parties did not litigate, and the trial court did not determine, whether these separate causation theories were preempted by FIFRA. Therefore, we need not address them on appeal. Nevertheless, we note that these separate causation theories would not contradict the Eblings' response to Interrogatory No. 26 because the Eblings expressly reserved the right to assert new causation theories in that interrogatory.

## C. Design Defect Theory

■■■■■ DowElanco and LCC both claim that the Eblings' design defect theory is preempted under FIFRA. We disagree. Liability for injury under Indiana's Product Liability Act is premised on the claim that the product in question is in "a defective condition unreasonably dangerous." Ind.Code § 34–20–2–1. A product may be defective because it was defectively designed. *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277 (Ind.1983). In an action based on an alleged design defect in the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product. Ind. Code § 34–20–2–2.

A product is in a defective condition if it is in a condition: "(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption." Ind. Code § 34–20–4–1. Unreasonably dangerous refers to "any situation in which the

use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated *by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers."* Ind.Code § 34–6–2–146 (emphasis added).

The majority of jurisdictions have held that FIFRA does not preempt strict product liability claims relating to product design, manufacturing or testing as long as they are not based on inadequacy in the product's labeling or packaging. *See, e.g., National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602 (8th Cir.1999); *Papas II*, 985 F.2d at 520; *Worm*, 5 F.3d at 744; *Lewis v. American Cyanamid Co.*, 294 N.J.Super. 53, 682 A.2d 724 (1996); *Babalola v. Crystal Chemicals*, 225 A.D.2d 370, 644 N.Y.S.2d 1 (1996); *Eide v. E.I. Du Pont De Nemours & Co.*, 542 N.W.2d 769 (S.D.1996); *Oeffler v. Miles, Inc.*, 169 Misc.2d 447, 642 N.Y.S.2d 761 (1996); *Arkansas–Platte & Gulf Partnership v. Dow Chemical Co.*, 886 F.Supp. 762, 767 (D.Colo.1995); *Reutzel v. Spartan Chemical*, 903 F.Supp. 1272, 1282 (N.D.Iowa 1995); *Jillson v. Vermont Log Bldgs.*, 857 F.Supp. 985, 991 (D.Mass.1994); *Higgins v. Monsanto Co.*, 862 F.Supp. 751, 759 (N.D.N.Y.1994); *Wright v. Dow Chemical U.S.A.*, 845 F.Supp. 503, 507 (M.D.Tenn. 1993).

■■■■ We find this authority persuasive and conclude that FIFRA does not preempt the Eblings' design defect claim. As discussed earlier, the scope of FIFRA's express preemption provision only extends to claims which are predicated on failure to warn or convey information through its labeling and packaging. We fail to see how our state-imposed standard of care relating to product design and manufacturing can constitute a labeling requirement under FIFRA.

■■■■ A product liability claim premised on a design defect under Indiana's Product Liability Act focuses on the dangerous pro-

pensities of a product due to its inherent properties and is not predicated on the adequacy of warnings on a product's labeling or packaging. The essence of a design defect claim is "that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product." I.C. § 34–20–2–2. Such a statutorily imposed duty would not impose any labeling requirements "in addition to or different from" those required by the EPA. Indeed, neither DowElanco nor LCC make any express contention to the contrary on appeal.[12] Here, the essence of the Eblings' design defect claim does not challenge the size, content, or placement of the Dursban or Creal–O labeling. Instead, the Eblings have asserted that these pesticides are defective as a result of their design. As appropriately noted in *National Bank of Commerce*, "[a]lthough the specifications and ingredients may be known, approved and accounted for in the EPA-approved label, a defect may still occur as a result of inadequate manufacturing or inappropriate design." 165 F.3d at 609.

■ In all, we fail to see how our state-imposed standard of care relating to product design and manufacturing can constitute a labeling requirement under FIFRA.

In light of the presumption against preemption which counsels a narrow construction of § 136v(b), we conclude that FIFRA does not preempt strict liability claims relating to product design defects.

■ Nevertheless, DowElanco and LCC argue that because Indiana uses the consumer expectations test for determining liability in defect claims, such claims are preempted "because consumers may not expect more than the FIFRA-mandated labeling provides." Brief of DowElanco, p. 42.[13] In support of this argument, they rely on *Lescs v. Dow Chemical Co.*, 976 F.Supp. 393, 399 (W.D.Va.1997), *aff'd mem.*, 168 F.3d 482 (4th Cir.1999). In *Lescs*, a homeowner whose residence had been treated with insecticide sued an exterminator and the manufacturer of the insecticide, alleging in part that the insecticide was unreasonably dangerous in its design. The manufacturer argued that the homeowner could not show that its product is unreasonably dangerous in design based on consumer expectations because such a claim is preempted by FIFRA. The *Lescs* court agreed that the plaintiff's claim of unreasonably dangerous design was preempted by FIFRA, reasoning that "[f]or this court to allow a claim of defec-

---

**12.** In the proceedings below, DowElanco argued that "[t]he only thing the DowElanco Defendants could have done to dispel [a subjective expectation of perfect safety ] ... would have been to issue stronger or more elaborate warnings." (R. 172). However, this argument ignores the essence of the Eblings' design defect claim and the purpose of Indiana's Product Liability Act. To avoid liability, DowElanco need not alter its labeling or packaging but merely exercise reasonable care in the design of its product. This statutory duty does not implicate FIFRA's preemption provision.

**13.** DowElanco's argument is premised on the following reasoning: "Ordinary consumers and users do not develop expectations in a vacuum. Rather, they develop expectations based upon information conveyed to them, or upon omissions from such information. When the product is a FIFRA-regulated pesticide, that information comes from the EPA-approved labeling." *Id.*

We disagree with any suggestion that the only information formulating consumer expectations comes from EPA-approved labeling. While EPA standards are readily identifiable for a given product at a given time, the ordinary consumer expectation regarding the dangers of a product requires "a factual examination of what society demanded or expected from a product." *See Sexton v. Bell Helmets, Inc.*, 926 F:2d 331, 337 (4th Cir.), (applying Kentucky law), *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). A variety of sources outside of EPA-approved labeling may influence consumer expectations about a product, including: industry practices, consumer knowledge of dangers, the existence of published literature, and evidence of what ordinary consumers consider defective. *See id.* Indeed, many consumers, like the Eblings, are not given EPA-approved labeling for products.

tive design based on consumer expectations would represent an unwarranted end-run around federal preemption." *Id.* at 399. In reaching this conclusion, the court relied exclusively on the reasoning of *Papike v. Tambrands, Inc.,* 107 F.3d 737 (9th Cir.1997).

In *Papike,* a plaintiff brought a product liability action against Tambrands, Inc. for injuries she sustained while using the manufacturer's tampons. The district court dismissed plaintiff's design defect claim, concluding that the plaintiff failed to meet either the "consumer expectation" test or the "risk-benefit" test under California law. *Id.* at 743. With respect to the consumer expectation test, *Papike* affirmed the lower court, summarily reasoning as follows:

> Tambrands' warnings met the federal requirements and Papike's design defect claim therefore fails the 'consumer expectation' test. To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate.

*Id.*

*Papike,* which was *Lescs'* sole authority for supporting FIFRA preemption, is distinguishable from *Lescs* and provides no support for the conclusion that a "consumer expectation" design defect claim is preempted by FIFRA. First, *Papike* did not address whether the preemption provision of a federal statute preempted the plaintiff's "consumer expectation" design defect claim. In fact, *Papike* did not discuss preemption of design defect claims at all. Instead, the *Papike* court merely concluded that the plaintiff did not satisfy the "consumer expectation" test. Further, the rationale in *Papike* has no place in the express preemption analysis as espoused in *Cipollone.* In the *Cipollone* analysis we consider whether the legal duty that is the predicate of the Eblings' design defect claim constitutes a "requirement[ ] for labeling or packaging in addition to or different from" the EPA regulations. 7

U.S.C. § 136v(b); *Cipollone,* 505 U.S. at 524, 112 S.Ct. at 2621.

DowElanco also cites *Haddix v. Playtex Family Products Corp.,* 138 F.3d 681, 686 (7th Cir.1998), claiming that the case held that "federally-mandated labeling under the MDA preempted design defect claims premised on the consumer expectation test." Br. of DowElanco, p. 43. Like *Papike, Haddix* did not address whether a design defect claim was federally preempted. To the contrary, the court addressed the issue of whether the trial court properly entered summary judgment in favor of a defendant on a design defect claim because the plaintiff "had failed to meet the requirements of the consumer contemplation test." *Id.* at 686.

By recognizing the Eblings' design defect claim, we are not requiring information on the Dursban or Creal–O labeling to be "different from" or "in addition to" the information FIFRA requires. To the contrary, we are merely recognizing a duty of manufacturers of potentially dangerous products to guard against design defects. This requirement does not frustrate the will of Congress or interfere with FIFRA's purpose of establishing a uniform standard for labeling and packaging.

## D. *Estoppel*

In the summary judgment proceedings, the Eblings contended that DowElanco's violation of FIFRA could create an estoppel preventing DowElanco from asserting FIFRA preemption as a defense. The trial court agreed, ruling that DowElanco could be "estopped from asserting the protection of FIFRA preemption because of ... failure to report material information to the EPA...." (R. 1112).

At least one court has attempted to moderate the harsh results of FIFRA's preemption of common law damage actions by preventing a registrant from asserting preemption as an affirmative defense when the registrant withholds information from or misinforms the EPA. In *Roberson v.*

*E.I. Dupont De Nemours & Co.*, 863 F.Supp. 929 (W.D.Ark.1994), orchard owners brought negligence, strict liability and breach of warranty claims alleging that the contamination of a fungicide caused damage to their orchard. The plaintiffs alleged that DuPont was aware that: 1) the ingredients of its product were not accurately stated on the label; 2) that its product was three times denser than labeled so that the application rate was in error; and 3) that the packaging leaked and was inadequate. *Roberson* determined that FIFRA expressly preempts failure to warn claims, and concluded that the plaintiffs' claims would be preempted to the extent that they were premised on inadequate failure to warn or inadequate packaging. *Id.*

Observing that this result would be inequitable, the court stated that to allow preemption would "permit a manufacturer that was ... aware of dangers to refrain from informing EPA of needed changes in its product label and then to hide behind the very label it knew to be inadequate." *Id.* at 933 (citation omitted). Therefore, *Roberson* held that DuPont could be estopped from asserting preemption of packaging and labeling claims to the extent that it withheld material facts from the EPA, either at the time of registration or later. *Id.* at 933.

*Roberson* found that its holding furthers federal control of pesticide labeling and packaging and protects the integrity of the pesticide regulation process by giving pesticide manufacturers an incentive to place all relevant facts before the EPA. *Id.* at 933. The court further determined that it would not be necessary for the jury to determine whether the information withheld would have led the EPA to materially alter the contents of the warning on the product label. *Id.* According to *Roberson,* the "EPA will have never made any determination at all with regard to the facts withheld." *Id.* In its decision, the *Roberson* court extended the reasoning of *Hurley v. Lederle Lab. Div. of Am. Cyanamid,*

863 F.2d 1173, 1179–80 (5th Cir.1988), in which the Fifth Circuit held that a manufacturer who withholds information from the FDA no longer receives preemption protection.

However, there is a line of cases contrary to *Roberson* that hold that a manufacturer is not prevented from asserting preemption even when it has allegedly withheld information from the EPA or failed to comply with FIFRA requirements. Apparently relying on the doctrine of separation of powers, these cases provide that it is beyond the power of the courts to analyze the performance of an expert regulatory agency such as the EPA, and furthermore, that such an analysis is not relevant to preemption. *See, e.g., Reutzel v. Spartan Chemical Co.,* 903 F.Supp. 1272, 1283 (N.D.Iowa 1995); *Taylor AG Industries,* 54 F.3d at 561. In *Papas I,* the plaintiff invited the court to recognize an exception to FIFRA preemption of labeling claims for instances in which a manufacturer has failed to provide the EPA with complete information on the pesticide. 926 F.2d at 1026 n. 8. Declining the invitation, *Papas I* determined that

> it would be up to the EPA—and not a jury—to determine first (1) whether the information provided was incomplete or inaccurate; (2) whether the omitted information is insignificant enough to mandate a change in the label; and (3) how, if at all, the label should be corrected.

*Id.* In *Papas II,* the Eleventh Circuit reiterated its conclusion in *Papas I* that claims that a defendant manufacturer provided misinformation to the EPA would not block preemption. The court reasoned as follows:

> [I]t is for the EPA Administrator, not a jury, to determine whether labeling and packaging information is incomplete or inaccurate, and if so what label changes, if any, should be made. States may not interfere with the methods designed by Congress to achieve FIFRA's goals. We think FIFRA leaves states with no

authority to police manufacturers' compliance with the federal procedures.

*Id.* at 519 (citations omitted).

We agree with the reasoning of *Papas II, Reutzel,* and *Taylor AG Industries.* FIFRA preempts any state law claim challenging the adequacy of the EPA-approved labeling, and this preemption is not dependent upon proof of a manufacturer's compliance with EPA regulations. Consequently, whether the EPA approved the Dursban label based on all available and necessary information is irrelevant to the preemption inquiry. We agree with Dow-Elanco that the Eblings' state law "estoppel" theory may not be used to override Congress' intent to preempt these claims. *See Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165 (1942) (noting "rules of estoppel will not be permitted to thwart the purposes of statutes of the United States.").

## II. *Strict Liability: Eblings v. Affordable*

In the proceedings below, the Eblings alleged that Affordable is strictly liable under the Indiana Product Liability Act for distributing and applying a defective product. Affordable claims that because the transaction between Prestwick Square and Affordable was wholly or predominantly service oriented—and not the sale of a product—the Indiana Product Liability Act is not applicable. The Eblings argue that the evidence reveals that the transaction was not predominantly for the sale of a service but for the sale of a product. Therefore, according to the Eblings, Indiana's Product Liability Act applies.

■ Indiana's Product Liability Act governs all actions brought by a user or consumer against a manufacturer or seller for the physical harm caused by a product. I.C. § 34-20-1-1; Ind.Code § 34-6-2-115 (defining "product liability action"). The term "product", for purposes of the Indiana Product Liability Act, means "any item or good that is personalty at the time

it is conveyed by the seller to another party." Ind.Code § 33-1-1.5-2 (see now Ind.Code § 34-6-2-114). However, the term "does not apply to a transaction that, by its nature, involves wholly or predominately the sale of a service rather than a product." *Id.* The pest control transactions at issue were obviously not wholly for the sale of a service because Affordable procured and applied Dursban, a product, in the Ebling apartment. Therefore, the issue is whether the transaction was *predominately* for the sale of a service, for purposes of the Indiana Product Liability Act.

■ Although no Indiana court has addressed the issue of whether the application of a pesticide constitutes a product or service, we have addressed the product/service distinction on several occasions. For example in *Hill v. Rieth–Riley Constr. Co.,* 670 N.E.2d 940 (Ind.Ct.App.1996), we looked to the "predominate thrust" of a contract in determining whether a transaction was the sale of a product within Indiana's Product Liability Act. *Id.* at 943. We concluded that the fact that a contract required incidental installation of concrete plugs and rails on a guardrail did not change the predominate thrust of the contract to resurface an existing highway and a gravel shoulder into a product contract where it was undisputed that the resurfacing of the highway was a service. *Id.* at 943.

■ In a manner analogous to the analysis in *Hill,* our supreme court has adopted the "predominate thrust" test for determining whether a transaction is governed by the Uniform Commercial Code, which applies only to the sale of goods. *See Insul–Mark Midwest, Inc. v. Modern Materials, Inc.,* 612 N.E.2d 550, 553–554 (Ind.1993). Under the predominate thrust test, the applicability of the U.C.C. to a transaction is determined by considering "whether the transaction's 'predominant factor, its thrust, its purpose, reasonably stated, is the rendition of service, with

goods incidentally involved ... or is a transaction of sale, with labor incidentally involved.'" *Id.* at 554 (citation omitted). In applying this test, our supreme court considered the following factors: 1) the terms describing the performance required of the parties and the words used to describe the relationship between the parties; 2) the circumstances of the parties and the primary reason they entered into the contract; 3) the final product the purchaser bargained to receive, and whether it may be described as a good or a service; and 4) the costs involved for the goods and services, and whether the purchaser was charged for a good, or a price based on both goods and services. *Id.* at 555. We find these approaches useful in determining whether the transaction at issue was predominately the sale of a service.

Here, the designated material in this case convinces us that Affordable's work on behalf of Prestwick Square was predominately the sale of a service. Affordable is a professional applicator engaged in the business of pest control, which includes applying pesticides. As an applicator, Affordable was required to identify pest infestations and to develop a safe service program to control them in accordance with modern pest control procedures.

Prestwick Square's main purpose in entering into the pest control transaction was to eliminate or reduce the presence of certain pests in its apartment units. A review of the contract between Prestwick Square and Affordable, which is entitled "Commercial Pest Control Service Agreement," reveals that Prestwick Square intended to purchase a service, not a product. (R. 736). The first provision of the contract is entitled "Service Program" and provides that Affordable "will perform regular service for the control of" specified pests. The agreement also provided that, in the event of persistent infestation, Affordable would "provide additional *service* at no extra cost until the problem is under control." (emphasis added). Finally, the agreement provides that if Affordable "fails to comply with the specifications, they shall be given thirty (30) days notice to render satisfactory *service*." (emphasis added).

The materials to be used in the service were to be determined by Affordable, subject to the qualification that the materials had to conform to all federal, state and local ordinances and laws. This suggests that any materials Affordable used were only incidental to Affordable's performance under the agreement.

As for compensation, Affordable was not paid for the amount of Dursban it used, and nothing in the agreement required Affordable to use Dursban or any other pesticide to control pests and rodents. Indeed, the "materials" to be used to control pests was left to the discretion of Affordable. If the sale of Dursban was the essence of the agreement, presumably Prestwick Square would have paid a price based on the amount of Dursban used. However, compensation under the agreement was based solely on the number of units serviced.

In all, Affordable's pesticide control service was the predominate thrust of the agreement between Affordable and Prestwick Square and the use of Dursban, although not unimportant, was clearly incidental to the agreement. Therefore, Affordable was entitled to summary judgment on the Eblings' claims under Indiana's Product Liability Act.

### III. *Negligent Application of Pesticide: Eblings v. Affordable*

██ Affordable contends that the trial court erred in denying its motion for summary judgment on the Eblings' claims that it was negligent in applying Dursban to the Ebling apartment. We disagree. To establish a claim of negligence, a plaintiff must show: (1) a duty on the part of the defendant to conform his conduct to the standard of care arising from his relationship with the plaintiff; (2) the defendant failed to conform to the requisite standard

of care; and (3) injury to the plaintiff that was proximately caused by the breach. *McDaniel v. Business Inv. Group, Ltd.,* 709 N.E.2d 17, 20 (Ind.Ct.App.1999).

■ Initially, we note that Affordable characterizes its duty of care as a narrow duty "to apply the pesticide as directed by the EPA approved label," Br. of Affordable, p. 16, while the Eblings suggest that Affordable owed a much broader duty of reasonable care to the Eblings. Indiana tort law imposes liability for the failure to use ordinary and reasonable care where there is a duty to do so. *Kottlowski v. Bridgestone/Firestone,* 670 N.E.2d 78, 84 (Ind.Ct.App.1996), *trans. denied.* A duty of care "will be found by the courts where reasonable persons would recognize it and agree that it exists." *Stump v. Commercial Union,* 601 N.E.2d 327, 332 (Ind.1992). This determination involves the balancing of three factors: 1) the relationship between the parties, 2) the reasonable foreseeability of harm to the person injured, and 3) public policy concerns. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991).

In *Bradley v. Brown,* 852 F.Supp. 690 (N.D.Ind.1994), three employees brought a negligence action against a pesticide applicator who fogged a room in a building where they were employed. Applying the factors set out in *Webb,* the court concluded that the applicator owed a duty of reasonable care to the employees who worked in the building where the room was fogged with toxic pesticides to avoid injury to the employees. *Id.* at 695. Finding that it was unreasonable for the applicator to have fogged the room in the morning prior to the arrival of the employees, the court determined that the applicator had breached its duty by applying the pesticides in a manner that put the workers in danger. The court further concluded that the applicator's conduct constituted negligence per se because the applicator had failed to ventilate the building as directed by the pesticide label in violation of both 7 U.S.C. § 136j(a)(2)(G) and Ind.Code

§ 15–3–3.6–14(b), which both proscribe the use of any registered pesticide in a manner inconsistent with its labeling. *Id.*

■ Like the pesticides in *Bradley,* Dursban is toxic to humans. The EPA-approved Dursban label indicates that it may be harmful to humans if swallowed, absorbed through the skin or inhaled. We are compelled to conclude that like the applicator in *Bradley,* Affordable owed a duty of reasonable care in applying Dursban to the apartment to avoid injury to its occupants.

■ This conclusion notwithstanding, the question remains whether Affordable was entitled to summary judgment as a matter of law because it did not breach this duty. Rarely is a negligence action properly disposed of by summary judgment, particularly when the critical question for resolution is whether the defendant exercised the requisite degree of care under the factual circumstances. *Bunch v. Tiwari,* 711 N.E.2d 844 (Ind.Ct.App.1999); *Kottlowski,* 670 N.E.2d at 85. This issue is generally a question for the trier of fact, and not answerable as a matter of law. *Id.*

The Eblings alleged that Affordable breached its duty by applying an excessively high concentration of the pesticide and by failing to properly ventilate the Ebling apartment. Affordable contends that it did not breach its duty as a matter of law because the Eblings cannot show the "amount" of Dursban that was applied in their apartment. The argument continues that because the Eblings cannot demonstrate the amount of Dursban that was applied in their apartment, the Eblings "cannot show that any need existed to ventilate the apartment after any treatment done by Affordable." Brief of Affordable, p. 31.

■ Under Indiana's summary judgment standard, the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a

determinative issue, and only then is the nonmoving party required to come forward with contrary evidence. *Jarboe v. Landmark Community Newspapers,* 644 N.E.2d 118 (Ind.1994); Ind. Trial Rule 56(C). Thus, Affordable, as the moving party, had the initial burden of designating some evidence that it applied an "amount" of Dursban that would avoid injury to the Eblings. Simply demonstrating that the Eblings do not have sufficient evidence to prove the amount of Dursban actually applied in their apartment is not sufficient to demonstrate that it is entitled to summary judgment. *See Lenhardt Tool & Die Co. v. Lumpe,* 703 N.E.2d 1079, 1083 (Ind.Ct. App.1998). Because Affordable failed to designate any evidence in this regard, we find that a genuine issue of material fact remains as to whether Affordable breached its duty of care by applying an excessive amount or concentration of Dursban to the Ebling apartment.

Similarly, a genuine issue of material fact exists as to whether Affordable breached its duty of care by failing to properly ventilate the apartment. The Dursban label and the Dursban Material Safety Data Sheet warn users that the product can be hazardous to humans if inhaled. Affordable failed to designate any evidence that its employees ventilated the apartment during or after applying the Dursban. Accordingly, the trial court did not err when it denied Affordable's motion for summary judgment on this negligence claim.

The Eblings also claimed that Affordable was negligent by spraying on or near the children's toys and clothing. Arguing that it was entitled to summary judgment on this claim, Affordable directs this court's attentions to the testimony of Tracy Badgett. However, Badgett testified that he did not know the Eblings and that he could not remember how he sprayed in any particular apartment in Prestwick Square. Accordingly, Badgett did not expressly and unequivocally deny spraying on or around the Ebling children's toys or clothing. To the contrary, Badgett merely gave the following testimony as to how he "generally" sprayed pesticides in bathrooms of apartments:

> ... I'll go in the bathroom. If there's no clutter, like clothes lying around, they'll get a little bit, too. But if there's a lot of stuff, they didn't get it.

(Supp. R. 129). The affidavit of the Eblings' expert indicates that wipe samples of the Eblings' clothing and toys collected in 1997 revealed a "significant" presence of Chlorpyrifos, the active ingredient in Dursban. (R. 292). This evidence is sufficient to create a genuine issue of material fact as to whether Affordable sprayed Dursban in an area near the clothes and toys.[14]

## IV. *Abnormally Dangerous Activity*

In the proceedings below, the Eblings claimed that Affordable was strictly liable for the Eblings' injuries under Indiana common law because Affordable's application of Dursban in the Ebling apartment constituted an abnormally dangerous activity. Affordable first argues that "[t]he Eblings did not plead that Affordable was engaged in an abnormally dangerous activity and therefore all such allegations have been waived." Brief of Affordable, p. 32. However, Affordable has presented no argument or authority in support of this contention. Therefore, it is waived. Ind. Appellate Rule 8.3(A)(7).

Furthermore, the principles of notice pleadings are utilized in Indiana.

14. Affordable attacks the affidavit of the Eblings' expert witness, claiming that expert did not quantify the level of Chlorpyrifos residue on the clothes and toys, that the Eblings failed to establish any chain of custody of these items, and that the Indiana State Chemist did not report significant levels of Chlorpyrifos in swab samples taken shortly after the Eblings moved from their apartment. However, Affordable did not move to strike the relevant portions of the expert's affidavit. Further, the trier of fact is to resolve any conflict between the test results on the children's clothing and toys.

*Miller v. Memorial Hosp. of South Bend,* 679 N.E.2d 1329, 1332 (Ind.1997). It is well established that our rules of procedure do not require a complaint to state all the elements of a cause of action. *Id.* A plaintiff essentially need only plead the operative facts involved in the litigation. *Id.* A complaint's allegations are sufficient if they put a reasonable person on notice as to why a plaintiff sues. *Noblesville Redevelopment Com'n v. Noblesville Associates, Ltd.,* 674 N.E.2d 558, 563–64 (Ind. 1996). Here, although the phrase "abnormally dangerous activity" is not used in the complaint, the Eblings did allege that Affordable was strictly liable for the distribution and application of an unreasonably dangerous product that was the proximate cause of their injuries. We find these allegations sufficient to encompass a cause of action for strict liability based on the theory that Affordable engaged in an abnormally dangerous activity.

 Affordable next argues that it was entitled to summary judgment because it did not engage in an abnormally dangerous activity, and we agree. Indiana recognizes the doctrine of strict liability stemming from carrying on an ultra-hazardous or abnormally dangerous activity. *See Erbrich Products Co., Inc. v. Wills,* 509 N.E.2d 850, 853 (Ind.Ct.App.1987). An analysis of whether an activity is ultra-hazardous or abnormally dangerous requires a consideration of the following factors, as set forth in the Restatement (Second) of Torts § 520 (1977):

(a) existence of a high degree of risk of some harm to person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*See Inland Steel v. Pequignot,* 608 N.E.2d 1378, 1385 (Ind.Ct.App.1993). These factors are to be considered as a whole and the weight apportioned to each should be dependent upon the facts in each particular case. *Perez v. Southern Pacific Transportation Co.,* 180 Ariz. 187, 883 P.2d 424, 426 (1993). All of the factors need not be present for an activity to be considered abnormally dangerous. Restatement (Second) of Torts, § 520 Comment (f). Finally, the question of whether a defendant should be held strictly liable for ultrahazardous or abnormally dangerous activities is a question of law to be determined by the court. *Indiana Harbor Belt Railroad Co. v. American Cyanamid Co.,* 916 F.2d 1174 (7th Cir.1990).

 Here, the first and second factors weigh in favor of finding that spraying Dursban in a residential structure is abnormally dangerous. The Dursban label indicates that Dursban is toxic to humans and can even result in death if swallowed. Accordingly, Dursban is understandably an ultra-hazardous or abnormally dangerous material, and we recognize that great harm might result from certain kinds of exposure to the pesticide.

 Nevertheless, strict liability attaches only to ultra-hazardous or abnormally dangerous activities and not to ultrahazardous or abnormally dangerous materials. As stated in *Erbrich,*

we must not look at the abstract propensities or properties of the particular substance involved, but must analyze the defendant's activity as a whole.... If the rule were otherwise, virtually any commercial or industrial activity involving substances which are dangerous only in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable.

509 N.E.2d at 856.

The EPA regulations and determinations regarding Dursban provide policy

and value judgments regarding the application of Dursban in residential structures. Dursban is registered with the EPA and authorized for use in and around residential structures, including apartments and apartment complexes. Accordingly, the EPA has concluded that spraying the pesticide in the residential setting is generally an appropriate activity.

Further, the EPA may only register a pesticide if it determines that the pesticide, when used in accordance with widespread and commonly recognized practice, will perform its intended function without generally causing an unreasonable adverse effect on the environment, including humans. *See* 7 U.S.C. § 136a(c)(5). Thus, by registering Dursban, the EPA necessarily has concluded that the pesticide poses no unreasonable risk of harm to man or environment when properly applied in accordance with the directions on its labeling.

Similarly, FIFRA's legislative history indicates that Congress intended the EPA to undertake a comprehensive risk/benefit analysis in deciding whether to register a pesticide. *See Papas I*, 926 F.2d at 1022–23 (quoting S.Rep. No. 92–838, 92d Cong.2d Sess., reprinted in 1972 U.S.Code Cong. & Admin. News at 3996, 4032–33). Because the EPA registered Dursban, the EPA has necessarily determined that the health risks and other dangerous attributes of Dursban were outweighed by the benefits of the pesticide when used according to its label. We adopt the EPA's policy determination in this regard. We therefore find that the third, fifth and sixth factors weigh against finding this activity to be abnormally dangerous.[15] After weighing the foregoing factors as applied to the facts at hand, we conclude that the application of Dursban is not an ultra-hazardous activity warranting the application of strict liability for the resulting harm.

**15.** The parties failed to designate specific evidence about the extent to which spraying

## V. Punitive Damages—Eblings v. Affordable

Affordable also argues that the trial court erred in denying summary judgment on the Eblings' request for punitive damages. We disagree. "Punitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, over zealousness, mere negligence, or other human failing'." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993) (quoting *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137–38 (Ind. 1988)). In *Orkin Exterminating Co., Inc. v. Traina*, Ind., 486 N.E.2d 1019 (1986), our supreme court addressed the permissible grounds for an award of punitive damages, stating:

... punitive damages may be awarded upon a showing of willful and wanton misconduct, and we have no problem with Plaintiffs conception of willfulness and wantonness as not embodying malice, ill will or intent to injure. Rather, the perverseness that public policy will permit the courts to punish is conscious and intentional misconduct which, under the existing conditions, the actor knows will probably result in injury.

486 N.E.2d at 1023. *Traina* recognized the following examples of conduct warranting punitive damages: conscious indifference, heedless indifference, reckless disregard for the safety of others, reprehensible conduct, and heedless disregard of the consequences. *Id.*

Affordable's sole contention in its appellate brief is that it was entitled to summary judgment on the issue of punitive damages because the evidence shows that Affordable was not engaged in an ultra-hazardous or abnormally dangerous activity when it applied Dursban. However, punitive damages are not awarded

Dursban pesticide in a residential structure is a matter of common usage.

based upon whether a particular activity is abnormally dangerous. Instead, punitive damages require a finding that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, over-zealousness, mere negligence, or other human failing. Accordingly, Affordable has failed to demonstrate that the trial court erred in denying its motion for summary judgment on the Eblings' request for punitive damages.

Nevertheless, in its reply brief, Affordable acknowledges the proper standard for determining the award of punitive damages and baldly asserts that "the Eblings will not be able to make this showing under any circumstances." Reply Brief of Affordable, p. 19. This bald assertion, without any citation to the designated material, is insufficient to demonstrate that the trial court erred in denying summary judgment on the Eblings' request for punitive damages.

### CONCLUSION

In conclusion, we find that the Eblings' broader labeling dissemination theory and regulatory noncompliance theory against DowElanco are preempted by FIFRA. Similarly, we conclude that the Eblings' failure to warn claims against LCC premised on LCC's alleged duty to warn/instruct Prestwick Square and to provide all users/bystanders with Creal–O labeling information are preempted by FIFRA. The Eblings' failure to warn claim against Affordable is likewise preempted. Nevertheless, the Eblings' strict liability claims against DowElanco and LCC relating to design defects against DowElanco are not preempted.

Further, we conclude that Affordable was entitled to summary judgment on the Eblings' strict liability claims. However, genuine issues of material fact remain as to whether Affordable breached its common law duty of care when it applied Dursban in the Ebling apartment. Finally, we conclude that Affordable has failed to demonstrate that the trial court erred in denying summary judgment on the Eblings' request for punitive damages.

We affirm in part, reverse in part and remand.

SHARPNACK, C.J., concurring in part and dissenting in part with separate opinion.

ROBB, J., concurring and concurring in result as to Issue I with separate opinion.

SHARPNACK, C.J., Concurring in Part and Dissenting in Part.

I concur with the majority's resolution of all issues except one, and my disagreement on that issue is only partial. The issue upon which I disagree is whether any claim by the Eblings based upon defective design survives preemption under FIFRA. It is true, as the majority opinion states, that "the majority of jurisdictions have held that FIFRA does not preempt strict product liability claims relating to product design, manufacturing or testing as long as they are not based on inadequacy in the product's labeling or packaging." Op. at 900. The cases relied upon by the majority, however, do not focus upon design defect claims that are based upon the doctrine of consumer expectations, under which liability arises when "the use of [the] product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." *See* Ind.Code § 34–6–2–146; Op. at 900. This issue was discussed in *Lescs v. Dow Chem. Co.*, 976 F.Supp. 393 (W.D.Va.1997), *aff'd sub nom Lescs v. William R. Hughes, Inc.*, 168 F.3d 482 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000). In *Lescs,* the court concluded that any claim based on consumer expectations is preempted by FIFRA. As the court stated,

"The court is of the opinion that plaintiff cannot proceed under a consumer expectations theory to show defective design because such a claim is preempted by FIFRA. Dursban, like the product in *Papike,* complied with federal product labeling and registration requirements. Like the product in *Papike,* Dursban is regulated by a federal legislative scheme which broadly preempts state claims based on federally approved labeling. For this court to allow a claim of defective design based on consumer expectations would represent an unwarranted end run around federal preemption. The court is of the opinion that this aspect of plaintiff's claim of unreasonably dangerous design is preempted by FIFRA."

*Id.* at 399.

I agree with the *Lescs* court's analysis. FIFRA provides the means by which consumers and users are informed of an insecticide's properties and methods of application. State tort law that permits recovery based on consumer expectations different from those that could be supported by the information required to be set forth on labels by FIFRA is in effect no different than state tort law that allows recovery for failure to make warnings different from or in addition to those set forth on the label. Therefore, to the extent that the majority opinion would permit recovery on a design defect claim based upon consumer expectations, I dissent.

However, our product liability act also provides that "in an action based upon an alleged design defect in the product ... the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product...." Ind.Code § 34–20–2–2. That language supports the concept of a claim based upon negligence in design where it can be shown that an alternative design was reasonably available that would have eliminated or significantly reduced the risk of harm that was caused to the plaintiff. *See FMC Corp. v. Brown,* 551 N.E.2d 444, 446 (Ind. 1990) (holding that a jury could reasonably infer that a manufacturer defectively designed a crane where evidence existed that a safer, feasible design was available); *Miller v. Todd,* 551 N.E.2d 1139, 1143 (Ind.1990), *reh'g denied* (stating that "a claimant [in an automobile design defect case] should be able to demonstrate that a feasible, safer, more practicable product design would have afforded better protection"); *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1051 (Ind.Ct.App. 1990), *reh'g denied* (holding that a design defect claim based upon the existence of a safer alternative cigarette design was not preempted by the Federal Cigarette Labeling and Advertising Act); *Dias v. Daisy–Heddon, Inc.,* 180 Ind.App. 657, 664–665, 390 N.E.2d 222, 226–227 (1979) (noting that "evidence of alternative designs may be relevant to the question of whether the design in question is unreasonably dangerous," and holding that evidence of a BB gun's alternative design should have been admitted at trial, although the failure to do so was not error because the evidence was cumulative); *Marshall v. Clark,* 680 N.E.2d 1102, 1106, (Ind.Ct.App.1997), *reh'g denied,* 683 N.E.2d 1351, *trans. denied,* 698 N.E.2d 1186 (following *Dias* ). Such a claim would not be preempted by FIFRA because it would not be based upon inadequacy of warnings or consumer expectations about the product that were in addition to the information concerning the product required by FIFRA. To the extent that the majority would permit a design defect claim based upon alternative design, I concur.

ROBB, Judge, concurring and concurring in result as to Issue I with separate opinion.

Although I agree with most of the issues decided by the majority, I disagree with the majority's holding that the dissemination of the Environmental Protection Agency (the "EPA") approved written information accompanying a pesticide consti-

tutes "labeling" under Section 136v(b) of FIFRA. I believe that the dissemination of the EPA approved written information accompanying a pesticide comprises "packaging" under Section 136v(b) of FIFRA. However, I agree with the majority's conclusion that the Eblings' state common law claim of failure to warn is preempted by Section 136v(b) of FIFRA under the Supremacy Clause of the United States Constitution.

In 1972, Congress amended the United State Insecticide Fungicide and Rodenticide Act ("FIFRA"), adding Section 136v(b), which originally stated that "[s]uch State shall not impose or continue in effect any requirements for labeling and packaging in addition to or different from those required under this subchapter." In 1978, Congress amended Section 136v(b) of FIFRA, replacing the "labeling *and* packaging" language of the statute with "labeling *or* packaging." I believe that the 1978 amendment to Section 136v(b) of FIFRA is significant because the "or" amended into the statute connotes Congress' intention that the term "labeling" should be viewed as a separate and distinct entity from the term "packaging." Thus, the two terms connote different meanings and this court must view "labeling" and "packaging" independently from each other.

With regard to "labeling," prior to registering a pesticide, the EPA must determine if the pesticide's "labeling and other material" meet FIFRA's detailed requirements. 7 U.S.C.A. § 136(a)(c)(5)(B). Congress has defined the term "label" as "the written, printed or graphic matter on, or attached to, the pesticide ... or any of its containers or wrappers." 7 U.S.C. § 136(p). Moreover, Congress has defined the term "labeling" as "all labels and all other written, printed, or graphic matter— (A) accompanying the pesticide or device at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide or device...." 7 U.S.C. § 136(p)(2). Regulations promulgated pursuant to FIFRA specifically con-

trol the form and content of labels, including precautionary statements about the risks to humans and directions for safe use. 40 C.F.R. § 156.10(h)(2)(i)(A), 156.10(j). Final labeling is approved by the EPA only if it is "adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment." 40 C.F.R. § 156.10(i)($l$)(i). Thus, the term "labeling" as defined by Section 136v(b) of FIFRA encompasses all EPA approved written information that accompanies a pesticide as it is placed in the "stream of commerce." Therefore, state common law claims of inadequate labeling are expressly preempted by FIFRA under the Supremacy Clause of the United States Constitution.

However, neither the text nor the legislative history of FIFRA provides a definition of the term "packaging." I believe that the term "packaging" refers to the dissemination of the written information that accompanies a pesticide. Therefore, "packaging" entails the dissemination of the EPA approved written information that accompanies a pesticide, referred to as "labeling" under Section 136v(b) of FIFRA. For example, if a consumer purchased a pesticide, the EPA approved written information printed on the container or included in an accompanying written insert, placard, or leaflet would constitute "labeling" under Section 136v(b) of FIFRA. In contrast, the dissemination of that EPA approved written information to the general public who was not the original purchaser of the pesticide would comprise "packaging" under Section 136v(b) of FIFRA.

The cases cited by the majority generally address the adequacy of the form and content of the pesticide "label" as purchased by the initial consumer, whereas here we are confronted with the issue of the dissemination of the written information accompanying a pesticide: who ultimately receives the information contained

on the "label."[16] *See Taylor AG Industries v. Pure–Gro,* 54 F.3d 555, 561 (9th Cir.1995) ("Appellants' claim for inadequate point-of-sale warnings is preempted because their claim is premised ultimately upon the inadequacy of the product label."); *Papas v. Upjohn Co.,* 985 F.2d 516, 519 (11th Cir.1993) ("[A]ny claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging."); *Pitts v. Dow Chemical Co.,* 859 F.Supp. 543, 545 (M.D.Ala.1994) ("[p]laintiff's complaint ... challenges the adequacy of warning labels under which the defendants produced and sold Dusban TC."); *Goodwin v. Bacon,* 127 Wash.2d 50, 896 P.2d 673, 681 (1995) ("[A]n examination of Plaintiff's failure to warn claim leads back to his reliance on a showing of inadequate labeling."); *Jenkins v. Amchem Products, Inc.,* 256 Kan. 602, 886 P.2d 869, 882 (1994) ("[n]egligence claim or strict liability failure to warn claim based on a claim that communication by means other than labeling was inadequate necessarily challenges the label and is preempted by § 136v(b) of FIFRA."). However, regardless of whether the Eblings' state common law failure to warn claim is characterized as falling under the term "labeling" or "packaging" under Section 136v(b) of FIFRA, the Eblings' claim is preempted by FIFRA under the Supremacy Clause of the United States Constitution, and I concur in the result reached by the majority.

---

**16.** The Eblings specifically state that they "are not challenging the adequacy of the label's form or content...." Brief of Appellees

at 6. Instead, the Eblings argue that "the approved labeling information should have been provided to them." *Id.*