## NATURAL GAS ODORIZING, INC., Appellant–Defendant,

v.

**Kristy S. DOWNS, Individually and as Personal Representative of the Estate of Ivan Dean Downs, and as Guardian of Susan Downs and Matthew Downs, Appellee–Plaintiff.**

No. 61A01–9612–CV–396.

Court of Appeals of Indiana.

Sept. 18, 1997.

Rehearing Denied Dec. 5, 1997.

---

5. The current statute, effective July 1, 1997 raises this amount to $120. (Burns Code Ed.Supp.
1996).

Burton M. Harris, Julia Blackwell Gelinas, Sandra Boyd Williams, Locke Reynolds Boyd & Weisell, Indianapolis, W. Michael Shinkle, Davenport, IA, David Shinkle, Des Moines, IA, for Appellant–Defendant.

George M. Plews, Jeffrey D. Claflin, Donna C. Marron, Plews Shadley Racher & Braun, Indianapolis, for Appellee–Plaintiff.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

By amended complaint, Kristy S. Downs, individually, as the personal representative of the Estate of Ivan Dean Downs and as the guardian of Susan and Matthew Downs ("Downs"), joined Natural Gas Odorizing, Inc. ("NGO") as a defendant in a previously initiated lawsuit.[1] Downs alleged that NGO was strictly liable under the Indiana Product Liability Act for the death of Ivan Dean Downs ("Dean"), and for the injuries that Kristy Downs and her children, Susan and Matthew, had sustained in a natural gas explosion. Downs maintained that the odorant supplied by NGO had lost its distinctive odor, that it did not serve its purpose as a warning agent and that NGO failed to warn either Montezuma or the Downs that the odorant could lose its odorized characteristics.[2] NGO moved for summary judgment. After a hearing and several related motions, the trial court denied summary judgment in part and granted summary judgment in part for NGO. NGO now appeals, and Downs cross-appeals.

We reverse in part, affirm in part and remand.[3]

### ISSUES [4]

NGO and Downs present several issues for our review which we consolidate and restate as:

1. Whether a genuine issue of material fact exists as to the odorant's failure to perform as intended.

2. Whether NGO had a duty to warn about the dangers associated with odor fade.

3. Whether a genuine issue of material fact exists as to NGO's satisfaction of its duty to warn.

### FACTS

The Downs family lived at 1113 Jefferson Street in Montezuma. Their residence consisted of a one-story home with a full basement and a crawl space. They used a wood-

---

1. In their original complaint, Downs named the Town of Montezuma, Montezuma Municipal Gas Utility, Utility Safety and Design, Inc. and Panhandle Eastern Pipeline Company as defendants. She later amended her complaint to include Natural Gas Odorizing, Vesta Energy Company and Black Pipeline Construction, Inc.

2. Natural gas is odorless, colorless and highly explosive. Consequently, federal law requires that utilities add odorant to their natural gas lines. The odorant gives natural gas a "rotten egg" smell that warns of a gas leak. However, as natural gas passes through soil, it can lose its odorized characteristics and become undetecta-

ble by human senses. This process is referred to by the parties as "odor fade."

3. Oral argument was held on July 9, 1997.

4. At oral argument, Downs alluded to a second theory of strict liability, i.e., that odor fade constitutes a manufacturing defect under the Act. However, Downs did not cogently argue that theory or cite to relevant authority either before the trial court or on appeal, and we decline to address it on review. See Ind. Appellate Rule 8.3(7).

burning stove in their living room for heat during the winter months and also employed a gas-fueled furnace and water heater, both located in the basement. Montezuma Municipal Gas Utility ("Montezuma") supplied the natural gas to the residents of Montezuma, including the Downs family. NGO, an Oklahoma corporation, supplied the odorant to Montezuma that was used in Montezuma's natural gas supply as required by federal law.[5]

On January 21, 1993, the night of the explosion, Kristy and her children returned home after 9:00 p.m. and were in bed by about 11:30 p.m. Dean returned home from work at approximately 12:30 a.m.[6] Around 1:10 a.m., the Downs' house exploded, blowing out the walls and collapsing the roof. Witnesses reported hearing two explosions. Those explosions and the resulting fire destroyed the residence. Kristy, Suzanne and Matthew sustained injuries, including second and third-degree burns. Investigators discovered Dean's body the following day in what had been the living room.

The National Transportation Safety Board issued an accident report which concluded that "the probable cause of the accident was the failure of a corroded bare steel [pipe] coupling under stress from a growing tree root pressing downward on the curb box and transferring the load to the pipe and coupling." The Indiana Utility Regulatory Commission also issued a report which stated:

> The service line was leaking at a screw joint coupling just under the edge of the road east of the house. Cause of leak probably corrosion at screw joint threads. A hard dry ball of dirt about leak indicated leakage for about two weeks. Entire area—gravel—and bar tests showed gas up to house and to house direct[ly] south.

Downs filed suit against multiple parties involved in the sale, distribution, and supply of natural gas to the town of Montezuma for wrongful death, personal injury, and property damage. Downs' Amended Complaint, as it relates to NGO, alleges:

> The odorant sold by [NGO] to Montezuma failed to alert the Downs or any other person to the dangerous accumulation of natural gas in the Downs residence prior to the explosion and fire. The odorant was inherently defective or became defective due to a failure by [NGO] to instruct Montezuma in its proper use, or to warn Montezuma about conditions under which the odorant might lose its odor. [NGO] is strictly liable in tort, for damage suffered by the Downs' family ... to the extent that it supplied odorant to Montezuma in a defective condition unreasonabl[y] dangerous to consumers and their property.

## DISCUSSION AND DECISION

### Standard of Review

Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). At the time of filing a summary judgment motion or response, a party shall designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice and any other matters upon which the party relies for purposes of the motion. T.R. 56(C). Once the movant has sustained this burden, the opponent must respond by setting forth specific facts showing a genuine issue for trial; he may not simply rest on the allegations of his pleadings. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). In ruling on a summary judgment motion, all evidence must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party. *Bailey v. Manors Group*, 642 N.E.2d 249, 252 (Ind.Ct.App.1994), *trans. denied.* When reviewing the grant or denial of summary judgment, we apply the same stan-

---

**5.** The Code of Federal Regulations requires that natural gas be odorized so that it is readily detectable by a person with a normal sense of smell at one-fifth the lower flammable limit of the gas in the air. 49 C.F.R. § 192.625(a).

**6.** Dean typically returned home from work shortly after midnight. However, on the night of the explosion, Dean helped a co-worker after their shift ended, and he returned home later than usual.

dard as that used by the trial court. *Ramon v. Glenroy Constr. Co.*, 609 N.E.2d 1123, 1127 (Ind.Ct.App.1993), *trans. denied.*

### The Indiana Product Liability Act and Strict Liability

Strict product liability actions in Indiana are governed by the Indiana Product Liability Act ("the Act"). IND.CODE §§ 33–1–1.5–1 to 33–1–1.5–8 (amended 1995).[7] A product manufacturer is liable under the following statutory terms:

(a) One who sells, leases, or otherwise puts into the stream of commerce any product in a *defective condition unreasonably dangerous* to any user or

consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) the seller is engaged in the business of selling such a product; and

(2) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

IND.CODE § 33–1–1.5–3(a) (emphasis added). The Act further provides in relevant part:

(a) A product is in a defective condition under this chapter if, at the time it is conveyed by the seller to another party, it is in a condition:

(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and

(2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

(b) A product is defective under this chapter if the seller fails to:

(1) properly package or label the product to give reasonable warnings of danger about the product; or

(2) give reasonably complete instruction on the proper use of the product;

when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

IND.CODE § 33–1–1.5–2.5 (emphasis added). To establish a prima facie case of strict liability, the plaintiff must show that (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries.

### Issue One: "Odor Fade"

Downs' action is based upon NGO's failure to warn Montezuma and/or the Downs about the odorant's allegedly latent defect of "odor fade." As a threshold question, we must determine whether Downs has established that odor fade, and thus, the duty to warn against it, may have been implicated in the natural gas explosion at issue in this case. *See Issue Two*, discussed *infra*. Stated differently, to defeat NGO's motion for summary judgment, Downs must demonstrate that a genuine issue of material fact exists as to whether the odorant failed to perform as intended, thereby proximately causing their injuries.[8]

Downs directs us to the report issued by the Indiana Utility Regulatory Commission which concluded that gas had been leaking from the corroded pipeline for two weeks. Downs also designated the affidavit of Dr. Douglas B. Chisholm, an expert in the field of natural gas and odorants, who testified that natural gas was present in the Downs' basement at detectible levels for days prior to the explosion. Tests performed by the Indiana Utility Regulatory Commission indicate that significant concentrations of natural gas remained in the soil almost twenty-four

---

**7.** Since the initiation of Downs' lawsuit, the Indiana Product Liability Act has been amended substantially by P.L. 278–1995. However, our analysis is based upon the Act as it read prior to the 1995 amendments.

**8.** This is one of two proximate cause issues in this case. *See* discussion *infra* note 12.

hours after the gas line had been turned off on the morning after the explosion. Dr. Chisholm testified in his affidavit that because "[t]he rate that gas dissipates at atmospheric pressure is approximately equal to the rate that gas will accumulate under the same conditions," one could assume that gas had been accumulating in the Downs' basement over a period of days.

Chisholm further stated that accumulated gas in the basement of the Downs' home would have migrated upward into the house through duct work, vents, piping holes, electrical conduit holes, sewer drains, and other cutouts in the floor above the basement area. Finally, Chisholm testified that eye-witness reports stating that there were at least two different explosions indicate that gas was present at explosive concentrations both in the basement and in the house at the time that the gas was initially ignited. Chisholm concludes that "[i]f the odorant added by Montezuma to their gas system was functioning as it should have, the odor of gas should have been startling . . . ." Dean Downs arrived home just prior to the explosion. Upon returning home from work, he would typically eat a snack and read before going to bed. Thus, it is reasonable to assume that he was in a position to detect the smell of natural gas prior to the explosion.

NGO's designated evidence includes an affidavit from Duane V. Kniebes, also an expert in natural gas and odorants, who testified that the evidence surrounding the explosion conclusively demonstrates that neither Kristy, Suzanne nor Matthew Downs "ever had their noses in natural gas" when they went to sleep on the night of the explosion. Record at 4. That is, the Downs were not in a position to detect the odorant's smell. Kniebes further asserted that the evidence does not establish whether Dean Downs detected the odor of natural gas or whether he was even in a position to detect the natural gas. Finally, Kniebes stated that the evidence shows that gas accumulated in the Downs' basement for only a "relatively brief time (approximately two hours or less) . . ." and would not have migrated into the home. Thus, he concluded that the gas would not have been detectable by the Downs.

The designated evidence leads us to conclude that a genuine issue of material fact exists as to whether the odorant performed as intended. The parties dispute the duration of the gas leak, the extent to which the gas had migrated into the home, if at all, as well as the Downs' ability to detect the smell of natural gas. Those issues must be decided by the trier of fact. Accordingly, we affirm the trial court's partial denial of summary judgment on this issue.

### Issue Two: Duty to Warn

Downs argues that NGO had a duty to warn about odor fade and that the failure to do so rendered the product both defective and unreasonably dangerous. NGO counters that the duty to warn did not arise because the odorant is not a dangerous product. We disagree with NGO's contention.

 A product may be defective within the meaning of the Act because of a manufacturing flaw, a defective design, or a failure to warn of dangers in the product's use. *Hoffman v. E.W. Bliss Co.,* 448 N.E.2d 277, 281 (Ind.1983); *see also* 63 AM.JUR. 2d, *Products Liability* § 561. The duty to warn consists of two duties: (1) to provide adequate instructions for safe use, and (2) to provide a warning as to dangers inherent in improper use. 63 AM.JUR. at § 1136. The determination of whether a duty to warn exists is generally a question of law for the court to decide rather than one of fact. However, the adequacy of the warning is a question of fact for the jury. *Bautista v. Verson Allsteel Press Co.,* 152 Ill.App.3d 524, 105 Ill.Dec. 487, 491, 504 N.E.2d 772, 776 (1987).

 A manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no "defect" in the product itself. 63A AM.JUR. 2d, *Products Liability* § 1123 (1997). A failure to warn of a latent danger will, without more, cause the product to be unreasonably dangerous as marketed. *See Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1166 (Ind.Ct. App.1988), *trans. denied* ("the lack of adequate warning makes a dangerous product unreasonably dangerous"). Warnings are

typically expected on products that are intentionally marketed despite dangerous properties. *Id.* The Act imposes liability upon a manufacturer who puts into the stream of commerce any product without a reasonably adequate warning thereby leaving it in an unreasonably dangerous condition to any user, if such warning could be given in the exercise of reasonable diligence. *Id.*

■ Odorant is specifically manufactured to serve as a warning agent for natural gas leaks. Although odorant is not flammable or explosive on its own, it is intended to be commingled with natural gas, an inherently dangerous product. The safe use of natural gas requires the safe use of an odorant. NGO admits that it is impossible to manufacture an odorant that is not susceptible to odor fade and that every odorant, including the one at issue here, contains this latent characteristic. Thus, given the nature of the odorant, the manner in which it is used and the reason for its use, we conclude that NGO had a duty to provide adequate warnings and instructions with its product about odor fade. The failure to satisfy that duty renders the product both defective and unreasonably dangerous.

### Issue Three: Satisfaction of NGO's Duty to Warn

#### A. NGO's Duty to Warn the Ultimate User or Consumer

In granting partial summary judgment in favor of NGO, the trial court stated that "[i]f a duty to warn did exist, it was only between NGO and Montezuma and did not extend to the plaintiffs." Downs counters that NGO's duty to warn extended beyond Montezuma to include all foreseeable users and consumers of the odorant.

■ For a duty to attach under the Indiana Product Liability Act, the seller does not have to be in privity with the user or consumer. IND.CODE § 33–1–1.5–3(b)(2). Rather, the duty to warn extends to "any user or consumer"[9] in the "class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition." IND.CODE §§ 33–1–1.5–3(a), (b). Stated differently, the manufacturer, seller or distributor of a product has a duty to warn those persons it should reasonably foresee would be likely to use its product or who are likely to come into contact with the danger inherent in the product's use. 63A AM.JUR.2d, *Products Liability* § 1188 (annotations omitted). This duty to warn follows from the manufacturer's duty to anticipate the foreseeable uses of its product, and embodies the notion that the warning must be sufficient to adequately protect any and all foreseeable users from a product's latent dangers. *Id.* The manufacturer has a duty to warn the ultimate user of a product when the ultimate user is a party the manufacturer should expect to use the product. *See Hoffman,* 448 N.E.2d at 282.

■ The Downs family is among the class of persons that NGO could have reasonably foreseen as being subject to the dangers associated with odor fade. Natural gas consumers are the intended beneficiaries of an odorant's cautionary warning. It stands to reason, then, that the Act serves to protect those consumers if the manufacturer fails to provide adequate warnings or if the product fails to perform as intended. Thus, we conclude that NGO's duty to warn extended to Downs.

#### B. The "Sophisticated Intermediary" Defense

■ NGO contends that its duty to warn was satisfied even though the Downs did not receive any warnings about odor fade. Specifically, NGO argues that because Montezuma is a "sophisticated intermediary," NGO's duty to warn the Downs was discharged.[10]

---

9. The Act defines "user or consumer" as:
 [A] purchaser, any individual who uses or consumes the product, or any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question.
 IND.CODE § 33–1–1.5–2.

10. NGO initially raised the "sophisticated user" defense in its answer to the Downs' amended complaint. However, during oral argument, NGO referred to that defense as the "learned intermediary" exception. In Indiana, as in other states, the learned intermediary exception is limited to prescription drugs and medical devices.

■ As we have already stated, warnings generally must be given to the ultimate user or consumer. *See Dole Food v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 302, 935 P.2d 876, 880 (App.1996). Consequently, the duty to warn is non-delegable. *Jarrell*, 528 N.E.2d at 1164. However, courts have articulated several exceptions which permit delegation of the duty to warn or which limit the general obligation of a distributor to supply warnings to the ultimate user or consumer. *See Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008, 1012 (8th Cir.1989). Those exceptions are based, in large part, on the Restatement (Second) of Torts § 388 (1965) [11] which provides in relevant part:

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it. All sorts of chattels may be supplied for the use of others, through all sorts of third persons under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the

precautions which must be exercised in using it in order to make its use safe.

Restatement (Second) of Torts § 388 cmt. n.

■ The duty to warn stems from the view that a product manufacturer should have superior knowledge of its product. 63A Am.Jur.2d, *Products Liability* § 1195 (citing *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 252 S.E.2d 358, 366 (1979)). However, under the "sophisticated user" exception, there is no duty to warn when the dangers posed by the product are already known to the user. *Id.* That exception has been extended to limit the duty to warn the ultimate user when the product is sold to a "knowledgeable" or "sophisticated intermediary." *Id.*

■ To determine whether a manufacturer has satisfied its duty to warn by relying upon a sophisticated intermediary, courts should consider the following factors:

> [T]he likelihood or unlikelihood that harm will occur if the [intermediary] does not pass on the warning to the ultimate user, the trivial nature of the probable harm, the probability or improbability that the particular [intermediary] will not pass on the warning and the ease or burden of the giving of the warning by the manufacturer to the ultimate user.

*Dole Food*, 188 Ariz. at 303, 935 P.2d at 881 (quoting *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 433, 581 P.2d 271, 278 (App.1978)); *see also Jarrell*, 528 N.E.2d at 1164, 63A Am.Jur. 2d, *Products Liability* § 1193.[12] Further,

See *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 549 (1979). The "sophisticated user" and "sophisticated intermediary" exception are related but distinct concepts although the terms are often used interchangeably along with the "learned intermediary" and "bulk supplier" exceptions to the duty to warn. *See Dole Food Company v. North Carolina Foam Indus. Inc.*, 188 Ariz. 298, 303 n. 3, 935 P.2d 876, 881 n. 3 (App.1996). Because of the confusion that has resulted in the appropriate terminology and because several of these exceptions have never been applied in Indiana, we look to the substance of NGO's argument over its form. Accordingly, we analyze NGO's defense under the sophisticated intermediary exception.

**11.** Section 388 of the Restatement (Second) of Torts 2d specifically relates to product liability

actions grounded in negligence. However, the exceptions to the duty to warn have also been applied to failure-to-warn claims founded in strict liability on the theory that there is no doctrinal distinction between negligence and strict liability failure-to-warn actions under the Restatement. *See* 63A Am Jur. 2d, *Products Liability* § 1194; *see also Jarrell*, 528 N.E.2d at 1168 n. 7; *Dole Food*, 188 Ariz. at 302 n. 4, 935 P.2d at 880 n. 4.

**12.** The question remains in this case whether NGO's' failure to provide an adequate warning was the proximate cause of the Downs' injuries. *American Jurisprudence 2d* states:

> In approaching proximate cause in warnings cases, the focus in on the effect of giving a warning on the actual circumstances sur-

for the exception to apply, the intermediary must have knowledge or sophistication equal to that of the manufacturer or supplier, and the manufacturer must be able to rely reasonably on the intermediary to warn the ultimate consumer. 63A Am.Jur. 2d, *Products Liability* § 1195 (annotations omitted). Reliance is only reasonable if the intermediary knows or should know of the product's dangers. *Id.* Actual or constructive knowledge may arise where either the supplier has provided an adequate explicit warning of such dangers or information of the product's dangers is available in the public domain.[13]

Whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is almost always a question for the trier of fact. *See Dole Food*, 188 Ariz. at 303, 935 P.2d at 881. The manufacturer's reliance on the intermediary's alleged sophistication may be more or less reasonable given the product's nature, complexity and associated dangers, the likelihood that the intermediary will communicate warnings to the ultimate consumer, the dangers posed to the ultimate consumer by an inadequate or nonexistent warning, and the feasibility of requiring the manufacturer to directly warn the product's ultimate consumers. Ultimately, those factors must be balanced by the trier of fact.

Here, the designated evidence establishes that Montezuma, along with the natural gas industry as a whole, is generally aware of the dangers associated with odor fade.[14] However, that awareness does not necessarily discharge NGO's duty to warn, and we decline to adopt an "everybody knows" or common knowledge exception as a matter of law. Downs has presented evidence that NGO did not specifically inform Montezuma of the factors that may exacerbate odor fade or of the steps that can be taken to limit its effects.[15] In fact, as Downs emphasizes, the record establishes that NGO failed to provide Montezuma with any warning or instruction and further failed to insure that Montezuma would inform its natural gas consumers about odor fade. The parties further dispute whether it would be reasonable or feasible to require NGO to warn natural gas consumers directly. Given these many issues, we cannot conclude as a matter of law that NGO has satisfied, under the sophisticated intermediary exception, its duty to warn the Downs.

## CONCLUSION

In sum, we conclude, as a matter of law, that NGO had a duty to warn natural gas users and consumers about odor fade and that the failure to satisfy that duty renders the odorant defective and unreasonably dangerous. Whether NGO satisfied its duty

rounding the accident. The question is whether the plaintiff's injury was a natural and probable consequence of the failure to warn about the dangers associated with the product. This issue may require that the plaintiff show that an adequate warning would have altered the conduct which led to the injury.... The plaintiff may also be required to prove separately that the injuries were caused by the product from which the adequate warning was missing.... Liability in failure to warn cases cannot be predicated upon the claim that the giving of a warning would have prevented the purchase of the product.
63A Am.Jur. 2d, *Products Liability* § 1171.

**13.** We caution that a manufacturer's reliance on an intermediary's constructive knowledge rather than on actual knowledge is more problematic in instances in which the dangers associated with the product's use are relatively severe.

**14.** Montezuma admitted in its response to a request for admission that, "[i]t is common knowledge and known to Montezuma ... that when odorized natural gas leaks from underground

pipe and passes through soil, the natural gas can lose its odorized characteristics."

**15.** In support of that argument, the Downs again rely on the expert testimony of Dr. Chisholm who stated that several cost-effective measures can be taken to reduce the risk of odor fade. Those measures include over-odorization, precise testing of odorization levels on a frequent basis, alarm systems which detect and warn of gas accumulation, rigorous pipeline maintenance, especially for older pipeline systems like Montezuma's, and consumer education programs. Chisholm further stated that necessary safety precautions vary among utilities depending on the type of pipeline used, its age and the climate in which it is located. Therefore, Chisholm concluded that odorant producers, as specialists in their field, are in the best position to educate both utility companies and natural gas consumers about odor fade and to alert both parties as to the more specific risks that may be implicated.

through the sophisticated intermediary exception must be determined by the trier of fact. Similarly, whether odor fade proximately caused the Downs' injuries is a question that can only be resolved at trial. Accordingly, we affirm the trial court's partial denial of summary judgment against NGO, reverse the court's partial grant of summary judgment to the extent that it limited NGO's duty to warn to Montezuma and remand the case for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

ROBERTSON and RILEY, JJ., concur.