

I N T H E

# Court of Appeals of Indiana

**Carla Miller,**

*Appellant-Plaintiff*



FILED

Feb 20 2026, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

**Indiana Gas Company, Inc.,**

*Appellee-Defendant*

---

February 20, 2026

Court of Appeals Case No.
25A-CT-866

Appeal from the Clark Circuit Court

The Honorable William A. Dawkins, Magistrate

Trial Court Cause No.
10C02-2005-CT-67

---

**Opinion by Judge Foley**
Judges May and Altice concur.

**Foley, Judge.**

Carla Miller ("Miller") appeals from the trial court's order granting summary judgment in favor of Indiana Gas Company, Inc. ("Indiana Gas"). Miller raises the following restated issues for our review:

> I. Whether the trial court abused its discretion when it relied on certain evidence designated by Indiana Gas because the evidence was inadmissible;

> II. Whether the trial court erred in granting summary judgment in favor of Indiana Gas because genuine issues of material fact existed.

We affirm.

## Facts and Procedural History[1]

On May 19, 2019, at approximately 4:56 a.m., a natural gas explosion occurred at 904 Assembly Road, Jeffersonville, Indiana—the residence of Billy and Janet Phillips ("the Phillips Residence"). Janet Phillips ("Janet") awoke in the early morning hours to get ready for work, and when she flipped on a light switch in her basement, the spark caused an explosion. Billy Phillips ("Billy") was killed in the explosion, and the Phillips Residence was destroyed. Janet suffered grave personal injuries, and Miller, who lived next door to the Phillips

---

[1]Oral argument was heard on this case on January 27, 2025, in the Indiana Court of Appeals courtroom in Indianapolis, Indiana. We commend counsel on the excellent quality of their written and oral advocacy.

Residence, also suffered personal injuries and property damage as a result of the explosion ("the Incident").

[4] Indiana Gas is a public utility that provides natural gas service to retail customers through its pipelines subject to regulation by the Indiana Utility Regulatory Commission ("IURC") and the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA"). At the time of the Incident, Indiana Gas provided natural gas service to the Phillips Residence pursuant to the terms and conditions of the Tariff for Gas Service approved by the IURC ("the Tariff"). The Tariff states: "It shall not be the duty of [Indiana Gas] to inspect [the] Customer's piping, appliances or equipment." Appellant's App. Vol. VII p. 90. It also states: "[Indiana Gas] shall not be liable for damages caused by defective piping or appliances on [the] Customer's Premises." *Id*. at 96. Further, "[The] Customer shall furnish, install, and maintain all necessary piping beyond the outlet side of the [gas] meter. . . ." *Id*. at 90. The natural gas industry uses the concept of jurisdiction when addressing whether a natural gas incident involved pipelines owned by the utility—and thereby under the regulatory jurisdiction of the IURC and PHMSA—or gas lines owned by the customer, which would be outside of that jurisdiction. If the cause of a natural gas incident is deemed to be "not jurisdictional" or "non-jurisdictional," this means the source of the natural gas involved in the incident was not a leak from gas lines the utility owned or was responsible for. *Id*. at 18.

[5] Natural gas is colorless, odorless, and highly flammable and explosive when mixed with air. Because of this, federal regulation 49 C.F.R. § 192.625(a) states

that "a combustible gas in a distribution line must contain a natural odorant or be odorized so that at a concentration in air of one-fifth of the lower explosive limit, the gas is readily detectable by a person with a normal sense of smell." The lower explosive limit ("LEL") of natural gas in air is approximately 5%, and therefore, the regulation requires that odorant in natural gas be "readily detectable by a person with a normal sense of smell" at no more than 1% gas in air. Appellant's App. Vol. VII pp. 147, 152.

[6] After the Incident, individuals from Indiana Gas and the IURC arrived at the scene to investigate. Indiana Gas performed its investigation under the observation of Dan Novak ("Novak") and Howard Friend ("Friend") from the IURC. Indiana Gas conducted a gas leak survey including bar hole testing, which consists of making a hole in the soil and testing for the presence of natural gas using a combustible gas indicator; walking along the gas main to check cleanouts and sewer manholes using a flame ionization unit to detect the existence of natural gas; and pressure testing the service line. The gas leak survey and pressure tests conducted on the service line into the Phillips Residence were both negative for leaks within the jurisdiction of Indiana Gas's facilities. Indiana Gas, accompanied by the Jeffersonville Fire Department, performed odorator readings at three locations near the Phillips Residence on the day of the explosion. An odorator is an instrument used to determine the percentage of gas in air at which the odor becomes readily detectable. The odorator readings were: 0.21% (next door to the north of the Phillips Residence); 0.21% (next door to the south of the Phillips Residence); and 0.28%

(across the street from the Phillips Residence). All three readings were well within the regulatory standard of no more than 1% gas in air.

[7] Indiana Gas's investigation revealed that the source of the natural gas was a section of gas pipeline inside the Phillips Residence basement that was uncapped and no longer connected to a fitting. The investigation determined that "[t]he cap had been removed from the open line by human intervention" and that "[t]o remove the pipe cap would require two wrenches, one to hold the pipe nipple and one to remove the cap." Appellant's App. Vol. VIII p. 9.

[8] The explosion triggered an excess flow valve installed underground on the service line to close, which immediately cut off all gas flow to the Phillips Residence. The excess flow valve functioned as it was designed to do. The gas meter at the Phillips Residence had an Encoder Receiver Transmitter ("ERT") that stored a rolling forty days' worth of readings. The ERT data collected from the gas meter showed a sudden increase in gas flow that started between 3:00 p.m. and 4:00 p.m. on May 18, 2019—the day before the explosion. After 4:00 p.m. on May 18, gas continued flowing at a high rate until the explosion, which indicated natural gas flowed at a high rate into the Phillips Residence for approximately thirteen hours before the explosion.

[9] No Indiana Gas personnel were at the Phillips Residence on May 18, 2019, which was a Saturday. The only individuals present at the Phillips Residence on May 18 were Billy and Janet Phillips. On May 18, both Billy and Janet worked in the yard from around 8:00 or 9:00 a.m. until 3:00 or 4:00 p.m. When

Janet finished, she left to go to the grocery store and get gas for her car while Billy remained alone at the residence. Billy was the only individual at the Phillips Residence during the approximate time when the ERT data showed the sudden increase in gas flow began. There was evidence that Billy completed plumbing, electrical, painting, drywall, and flooring projects and kept tools at the Phillips Residence.

[10] The IURC prepared a Final Incident Report ("IURC Report") authored and signed by Friend and Novak, who were both present at the scene following the explosion and observed Indiana Gas's investigation. The IURC Report concluded that the "leak survey was negative for gas leaks" on Indiana Gas's pipelines, "odorant levels [were] within the acceptable range," and "the cause of this [I]ncident [was] not jurisdictional." Appellant's App. Vol. VII pp. 135–36, 140–41. The IURC submitted the IURC Report to PHMSA. The IURC did not issue any notices of probable violation or take any enforcement action against Indiana Gas arising from the Incident, nor did it assess any fines against Indiana Gas.

[11] On May 28, 2020, a complaint was filed on behalf of Billy and Janet Phillips against multiple entities, including Indiana Gas. On May 19, 2021, Miller filed a motion to intervene in the action, which was granted by the trial court on April 12, 2021. Miller brought claims alleging product liability under the Indiana Product Liability Act ("the IPLA"), negligent product liability, negligence, negligent hiring, negligent training, negligent supervision, negligent retention, and negligent failure to warn in connection with the Incident.

Miller's product liability claim under the IPLA alleged that Indiana Gas's "natural gas distribution system" was defective and that the natural gas Indiana Gas supplied to its customers was also defective because it purportedly "lacked the required odorant." Appellant's App. Vol. II pp. 118, 120. Miller's negligence-based theories identified a number of alleged breaches, including Indiana Gas's purported failure to "properly perform tests on its natural gas lines" and the natural gas, "inspect the gas lines" and other facilities, and supply its customers with natural gas containing "levels of odorant consistent with the requirements of any and all applicable Local, State, and/or Federal laws and/or Administrative regulations[.]" *Id.* at 120–21.

[12] On November 26, 2024, Indiana Gas filed a motion for summary judgment on Miller's claims, arguing that a gas utility only has a duty for gas lines that it owns and does not owe a duty for customer-owned gas lines. Indiana Gas asserted that its duty ended at the outlet side of the gas meter and did not extend inside the Phillips Residence. In support of this assertion, Indiana Gas designated evidence, including the determination of the IURC, that the cause of the Incident was "non-jurisdictional," meaning the cause of the Incident was not a leak on the gas lines that Indiana Gas owned or was responsible for. Appellant's App. Vol. VII pp. 16–18, 131, 133, 135–36, 138, 140–41, 147–48, 157, 167–68, 172; Appellant's App. Vol. VIII p. 14.

[13] Indiana Gas also contended that the natural gas supplied to the Phillips Residence was not defective and had been properly odorized as required by federal regulation. Indiana Gas's designated evidence in support of this

contention included odorator readings, which found natural gas odorant levels in the area to be well within the regulatory standard, and the IURC's determination that "the odorant levels [were] within the acceptable range." Appellant's App. Vol. VII pp. 17, 121, 135–36, 138, 140–41. Indiana Gas further designated evidence that the source of the natural gas involved in the Incident was an uncapped gas line inside the Phillips Residence that someone other than Indiana Gas had intentionally opened. *Id.* at 18, 131, 159, 168; Appellant's App. Vol. VIII pp. 9, 14. Based on the designated evidence, Indiana Gas asserted that it could not be liable for the Incident because it did not have any duty concerning the leak on a customer-owned gas line, because the gas was properly odorized, and because Indiana Gas did not proximately cause the Incident.

[14] On December 13, 2024, Miller and Indiana Gas submitted a Proposed Agreed Order, which the trial court approved, extending Miller's deadline to respond to Indiana Gas's Motion for Summary Judgment to January 10, 2025. On January 2, 2025, the trial court approved an amended case management plan that had been agreed to by the parties. This case management plan established separate deadlines for Miller to disclose her expert witnesses by January 24, 2025, and for the parties to complete discovery by May 9, 2025. Miller did not file a motion under Trial Rule 56(I) to extend the time within which to respond to Indiana Gas's Motion for Summary Judgment past the January 10, 2025 deadline, and she did not submit any affidavits under Trial Rule 56(F) showing the need for a continuance of the January 10, 2025 deadline to obtain

additional affidavits, take additional depositions, or conduct more discovery before responding to Indiana Gas's motion for summary judgment.

[15] On January 10, 2025, Miller filed her brief and designation of evidence opposing Indiana Gas's motion for summary judgment. Miller argued that summary judgment was not appropriate because there were material issues of fact in dispute as to whether Indiana Gas properly odorized the natural gas it provided to the Phillips Residence and whether it had a duty to warn of odor fade, which is a condition where the odorant in the gas "is depleted by adsorption onto the inner pipe wall of newly installed gas pipelines thus reducing the level of odorant in the gas." Appellant's App. Vol. VII at 153. Miller also contended that the IURC Report and the affidavits of Friend and Novak were inadmissible and should be stricken. Miller did not designate any expert reports or expert testimony in opposition to Indiana Gas's motion. Instead, Miller designated evidence including deposition testimony of Janet that she never smelled natural gas in her home prior to the explosion. She stated that Billy never told her that he smelled gas at their residence during the time they lived there. Miller also designated evidence that several individuals who arrived to the scene of the Incident did not smell natural gas; these individuals included Jeffersonville Fire Department Captain Jason Sharp ("Captain Sharp") and Indiana Gas employee Jeff Higdon ("Higdon").

[16] Miller also designated evidence that "[a] person with a normal sense of smell should have been able to identify a readily detectable odorant in the—in the gas that we delivered to them" given the amount of gas in the home prior to the

explosion. Appellant's App. Vol. X p. 101. Miller designated evidence that in April 2019 Indiana Gas performed "sniff tests" in Madison, Indiana, which is approximately forty miles from the Phillips Residence. The "sniff testing" revealed that the amount of odorant in the natural gas did not become readily apparent until the reading was 1%. *Id*. at 40. Indiana Gas's corporate representative testified that readings of 1% or above would "raise a question" and "could be an indication that . . . the odorant level could be low, . . . or it could be the equipment they're utilizing is a problem." Appellant's App. Vol. IX p. 244; Appellant's App. Vol. X p. 41.

[17] Indiana Gas filed its reply in support of its motion for summary judgment on January 24, 2025, arguing that there is no genuine issue of material fact that Indiana Gas's responsibility for the natural gas delivered ended at the outlet side of the gas meter and that the source of the gas involved in the Incident was non-jurisdictional as it involved a pipe inside the Phillips Residence. Indiana Gas also asserted that it had no duty to warn of odor fade. Indiana Gas claimed that there was no genuine issue of material fact that the natural gas involved in the Incident was properly odorized under the applicable law and that the question for the trial court was not whether Janet smelled natural gas but whether the natural gas was properly odorized under 49 C.F.R. § 192.625, which is the legal standard for gas odorization. Indiana Gas further contended that there was no genuine issue of fact that it was not the proximate cause of the Incident.

To support its arguments in the reply brief, Indiana Gas relied on evidence it previously designated with its motion for summary judgment. Specifically, as to whether Janet could smell the gas, Indiana Gas highlighted evidence that Billy smoked marijuana in the house daily and that there were a dog and a cat in the home, which could have masked the odor of gas. Further, as to the issue of odor fade, it pointed to the affidavit of John Erickson, an expert on the natural gas industry, who explained that "[o]dor fade is a condition where odorant in gas is depleted by adsorption onto the inner pipe wall of newly installed gas pipelines thus reducing the level of odorant in the gas." Appellant's App. Vol. VII p. 153. He also stated that "[o]dor fade can occur on newly installed plastic or steel pipelines until the pipe has become 'pickled,' e.g. the inner wall of the pipe has adsorbed as much odorant as it can adsorb." *Id*. Regarding the Phillips Residence specifically, Erickson noted that "[t]he gas to [the Phillips Residence] on May 19, 2019 was delivered through a steel main that had been in service for approximately 48 years and a plastic service line that had been in service for over 18 years[,]" and that "[o]dor fade is not an issue with pipe that has been exposed to odorized gas for years." *Id*. He further stated that "[t]here is no evidence that odor fade was occurring in the gas" going to a neighboring residence and that there is "ample evidence that odor fade was not occurring in the Assembly Road area including post-accident odorant tests and Dan Novak of the IURC smelling gas at the meter set at 908 Assembly Road." *Id*. Further, Indiana Gas's evidence sets out that there is no state or federal regulation that requires it to notify customers or third parties about odor fade.

On February 3, 2025, a hearing was held on Indiana Gas's summary judgment motion. On March 14, 2025, the trial court entered its order granting summary judgment in favor of Indiana Gas and against Miller. Miller now appeals.

## Discussion and Decision

"We review the trial court's summary judgment decision de novo." *Z.D. v. Cmty. Health Network, Inc.*, 217 N.E.3d 527, 531 (Ind. 2023). A party is entitled to summary judgment "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "A genuine issue of material fact exists when there is 'contrary evidence showing differing accounts of the truth,' or when 'conflicting reasonable inferences' may be drawn from the parties' consistent accounts and resolution of that conflict will affect the outcome of a claim." *Z.D.*, 217 N.E.3d at 532 (quoting *Wilkes v. Celadon Grp., Inc.*, 177 N.E.3d 786, 789 (Ind. 2021)). "A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action." *Ind. Farmers Mut. Ins. Grp. v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). "A factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts." *Id*.

"In viewing the matter through the same lens as the trial court, we construe all designated evidence and reasonable inferences therefrom in favor of the non-moving party." *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 912 (Ind. 2017). "If there is any doubt, the motion should be resolved in favor

of the party opposing the motion." *Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 281 (Ind. 1994). The initial burden is on the moving party to demonstrate the absence of any genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

## I. Reliance on Inadmissible Evidence

[22] Miller argues that, in granting summary judgment in favor of Indiana Gas, the trial court improperly relied on inadmissible hearsay and unauthenticated documents. She specifically takes issue with the trial court's reliance on the IURC Report and the affidavits of Novak and Friend. A trial court's decision to admit evidence is generally reviewed for an abuse of discretion, and such discretion extends to rulings on motions to strike affidavits on the grounds that they fail to comply with the summary judgment rules. *Webb v. City of Carmel*, 101 N.E.3d 850, 856–57 (Ind. Ct. App. 2018) (citing *Morris v. Crain*, 71 N.E.3d 871, 877 (Ind. Ct. App. 2017)). We reverse a trial court's decision to admit evidence only if that decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*. at 857. In ruling on a motion for summary judgment, a court will consider only properly designated evidence that would be admissible at trial. *487 Broadway Co., LLC v. Robinson,* 147 N.E.3d 347, 353 (Ind. Ct. App. 2020).

[23] Miller asserts that the IURC Report was inadmissible hearsay and did not fall under the public records exception in Evidence Rule 803. Although Evidence Rule 803 exempts public records from the rule against hearsay, certain public records are excluded from this exemption, including "factual findings resulting from a special investigation of a particular complaint, case, or incident, except when offered by an accused in a criminal case." Ind. Evidence Rule 803(8)(B)(iv). However, here, Rule 803 is not applicable because the IURC Report did not constitute hearsay. Hearsay is defined as "a statement that . . . is not made by the declarant while testifying at the trial or hearing" that is offered for the truth of the statement. Evid. R. 801(c). The IURC Report contained the findings and conclusions of the declarants who prepared them, Friend and Novak, and was attached to the affidavits of both Friend and Novak, which served to authenticate the IURC Report. Both Friend and Novak were present at the scene of the Incident, personally observed the investigation conducted by Indiana Gas, and authored the IURC Report. *See* Evid. R. 901(a) (stating that the requirement of authenticating or identifying an item of evidence is satisfied when the proponent produces evidence sufficient to support a finding that the item is what the proponent claims it is); Evid. R. 901(b) (evidence may be authenticated by testimony of a witness with knowledge that an item is what it is claimed to be). The IURC Report was not hearsay, was properly authenticated by the accompanying affidavits, and was, therefore, admissible.

[24] Miller further contends that the affidavits of Novak and Friend were likewise inadmissible because they contained secondhand information from the individuals who actually performed the tests and were therefore inadmissible hearsay and not based on their personal knowledge. Trial Rule 56(E) states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." An affidavit does not need to "contain an explicit recital of personal knowledge when it can be reasonably inferred from its contents that the material parts thereof are within the affiant's personal knowledge." *City of Fort Wayne v. Consol. Elec. Distribs., Inc.*, 998 N.E.2d 733, 738 (Ind. Ct. App. 2013) (citations omitted).

[25] Although Miller contends that Friend's and Novak's affidavits contain secondhand information, the affidavits clearly establish that both Friend and Novak were present at the scene of the Incident and personally observed the testing discussed in the IURC Report. This information was thus not secondhand and did not constitute hearsay as the statements in the affidavits came from the personal knowledge and observations of both Friend and Novak. To the extent that Miller argues that Friend and Novak were not qualified as experts and therefore their testimony is not reliable under Evidence Rule 702, there is no evidence that Friend and Novak were proffered as expert witnesses. Both Friend and Novak were witnesses who had firsthand knowledge of the event contained within their affidavits, and their affidavits contained their

observations and not any expert opinions. Further, although Miller argues that both the IURC Report and the affidavits were inconsequential and irrelevant, the challenged evidence was relevant in that it constituted evidence regarding the IURC's investigation of the Incident and its report to the PHMSA, which is a federal agency that regulated gas pipelines. The IURC's investigation into the Incident was clearly relevant to determining the cause of the Incident. We, therefore, conclude that the trial court did not abuse its discretion in allowing the IURC Report and the affidavits of Friend and Novak to be used as designated evidence.

## II.    Summary Judgment Determination

Miller argues that the trial court erred when it granted summary judgment in favor of Indiana Gas as to her product liability claim.[2] She contends genuine issues of material fact exist as to whether the natural gas delivered to the Phillips Residence was properly odorized, which bars the granting of summary judgment.[3] Miller asserts that she designated evidence that created such an

---

[2] Although Miller's complaint contained a product liability claim and numerous negligence-based claims, on appeal she has abandoned her negligence-based claims and focuses solely on whether the trial court erred when it granted summary judgment as to her product liability claim. Miller does raise assertions in her brief that the trial court misapplied the IPLA in determining that summary judgment was proper and cites to findings made by the trial court discussing whether Indiana Gas was responsible for gas lines it does not own. *See* Appellant's Br. pp. 30, 31 (citing to Appellants' App. Vol II pp. 49, 52). In its order, the trial court granted summary judgment as to both the product liability claim and all of Miller's negligence claims, and the findings that she cites to dealt with the negligence-based claims. Therefore, to the extent that Miller argues that the trial court misapplied the IPLA, we focus only on the findings and conclusions pertinent to the product liability claims.

[3] In her complaint, Miller alleged a product liability claim under the IPLA regarding both the natural gas itself and the natural gas distribution system. In its summary judgment order, the trial court granted summary judgment as to all of Miller's claims against Indiana Gas. On appeal, Miller focuses her arguments

issue of material fact because the evidence established that Janet did not smell natural gas prior to the explosion and that Captain Sharp and Higdon did not smell gas when they arrived to the scene of the Incident. Miller claims that, in light of this designated evidence, the trial court engaged in improper weighing of the evidence in its determination that there was no genuine issue of material fact as to whether the natural gas was properly odorized. Miller further maintains that the trial court erred when it found that Indiana Gas had no duty to warn of odor fade in the present circumstances.

[27] The IPLA governs all actions that are: (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1. The IPLA recognizes three ways that a product can be defective: (i) a manufacturing defect; (ii) a defective design; or (iii) the manufacturer failed to give adequate information about the product, such as the failure to warn of dangers while using the product or inadequate instructions. *Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019) (citations omitted). Here, Miller alleged a manufacturing defect in the natural gas. "[T]he IPLA imposes liability although the manufacturer exercised all

---

solely on whether the natural gas itself was defective under the IPLA because it was under odorized. Because she has narrowed her argument on appeal to only this claim, she has waived any argument that summary judgment was improper on her claims that the natural gas distribution system was defective. *See Akin v. Simons*, 180 N.E.3d 366, 375 (Ind. Ct. App. 2021) (providing that "the law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived").

reasonable care in the manufacture and preparation of the product[,]" and "[t]herefore, a strict-liability standard applies to manufacturing-defect claims." *Bayer Corp. v. Leach,* 153 N.E.3d 1168, 1179 (Ind. Ct. App. 2020) (internal citations omitted). Under Indiana Code section 34-20-4-1:

> A product is in a defective condition . . . if, at the time [the product] is conveyed by the seller to another party, it is in a condition: (1) not contemplated by reasonable persons among those considered expected users of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

Therefore, Miller was required to prove that the natural gas was in a defective condition at the time it was distributed to the Phillips Residence and the improper odorization was what caused this defective condition.

[28] In its order, the trial court found that "[a]ll evidence in the [summary judgment] record supports the conclusion that Indiana Gas met the legal regulatory standard set forth in 49 [C.F.R. §] 192.625 for odorizing the natural gas delivered to the Phillips Residence." Appellant's App. Vol. II p. 54. The trial court acknowledged that Miller designated evidence that Janet did not smell gas prior to the explosion but concluded that this did not generate a genuine issue of material fact that the gas was properly odorized.

[29] Indiana Gas's designated evidence established that the odorization of natural gas is controlled by federal regulation. The federal regulation promulgated by PHMSA provides that "a combustible gas in a distribution line must contain a

natural odorant or be odorized so that at a concentration in air of one-fifth of the lower explosive limit, the gas is readily detectable by a person with a normal sense of smell." 49 C.F.R. § 192.625. Under this regulation, the odorant in natural gas must be "readily detectible by a person with a normal sense of smell" at no more than 1% gas in air. Appellant's App. Vol. VII p. 147 n.11. Indiana Gas designated evidence that odorator readings taken at the scene of the Incident in neighboring homes showed natural gas odorant levels to be well within the 1% upper limit for detection under the federal standard: 0.21% (next door to the north); 0.21% (next door to the south); and 0.28% (across the street). *Id.* at 17, 121. Indiana Gas's evidence also established that the IURC determined in its Final Incident Report that "odorant levels [were] within the acceptable range." *Id.* at 135–36, 140–41. The designated evidence also demonstrated that the Incident triggered an excess flow valve installed underground on the service line to close, which immediately cut off all gas flow to the Phillips Residence. The excess flow valve functioned as it was designed to do. This evidence designated by Indiana Gas was not disputed by Miller. Instead, Miller designated evidence that, prior to the Incident, Janet did not smell gas in the Phillips Residence and that Billy never told Janet that he smelled gas in the Phillips Residence. She also designated evidence that, when they arrived at the scene of the Incident, neither Captain Sharp nor Higdon smelled gas from the line located at the Phillips Residence.

[30] Construing the evidence in a light most favorable to Miller as the non-movant, we conclude that Indiana Gas's designated evidence established that there was

no genuine issue of material fact. Under the IPLA, Miller was required to prove that the natural gas provided by Indiana Gas was defective. However, Indiana Gas's designated evidence established that the odorization of natural gas is governed by federal regulation, and all of the odorator readings taken in the area surrounding the Phillips Residence were within the range required by federal regulation. After Indiana Gas presented its designated evidence demonstrating the absence of any genuine issue of fact as to a determinative issue of whether the natural gas was defective, the burden shifted to Miller to come forward with contrary evidence showing an issue for the trier of fact. *See Hughley*, 15 N.E.3d at 1003.

[31] Essentially, the only contrary evidence that Miller presented was that Janet did not smell any gas. Even if Janet did not smell gas in the Phillips Residence prior to the Incident, this merely establishes that she did not smell gas, not that it was not properly odorized under the federal regulation, which was the material fact at issue. Further, the evidence that Captain Sharp and Higdon did not smell gas when they arrived on the scene of the Incident is explained by the fact that the gas had been shut off to the Phillips Residence when the excess flow valve was triggered because of the Incident. Simply put, Miller's designated evidence is not material to the question of whether the gas provided by Indiana Gas was defective. The designated evidence establishes that there is no genuine issue of material fact that the natural gas was properly odorized under the federal regulatory standard and was therefore not defective under the IPLA.

[32] Miller next argues that the trial court erred when it held that Indiana Gas had no duty to warn of odor fade under the circumstances of this case. In its order, the trial court found that the only evidence in the summary judgment record established that odor fade was not implicated in the Incident, and even if it had been implicated, the evidence provided that there are no state or federal regulations that require Indiana Gas to notify customers about odor fade.

[33] As to odor fade, Indiana Gas designated evidence that odor fade is a phenomenon that "can occur on newly installed plastic or steel pipelines until the pipe has become 'pickled,' e.g. the inner wall of the pipe has adsorbed as much odorant as it can adsorb." Appellant's App. Vol. VII p. 153. However, the evidence here established that the pipes at issue for the Phillips Residence were older, with the steel main being in service for approximately forty-eight years and the plastic service line being in service for over eighteen years. Because these pipes had been exposed to natural gas for years, odor fade was not an issue. Indiana Gas also designated evidence that there are no state or federal regulations that require it to notify customers about odor fade. In response, Miller did not designate any evidence that odor fade was implicated in the Incident.

[34] Instead of relying on an evidentiary dispute as to the existence of odor fade, Miller relies on *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155 (Ind. Ct. App. 1997), *trans. denied*, where our court found that the designated evidence led to a conclusion that a genuine issue of material fact existed as to whether the odorant performed as intended because the parties disputed the duration of

the gas leak, the extent to which the gas had migrated into the home, if at all, as well as the plaintiffs' ability to detect the smell of natural gas. *Id*. at 161. Therefore, odor fade was found to be implicated in circumstances present in that case. *Id*. at 160–61. However, here the evidence designated to the trial court established that odor fade was not implicated in the Incident based on the age of the pipes involved. Thus, the *Downs* case is inapposite to the present case. Because Indiana Gas's designated evidence established that odor fade was not implicated in the Incident, and Miller designated no evidence to oppose this, there was no genuine issue of material fact regarding the duty to warn of odor fade.

[35] The moving party bears the initial burden of demonstrating the absence of any genuine issue of fact as to a determinative issue, and then the burden shifts to the non-moving party to come forward with contrary evidence showing a genuine issue of material fact for the trial court. *Ali v. All. Home Health Care, LLC*, 53 N.E.3d 420, 427 (Ind. Ct. App. 2016) (citing *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009)). Because the designated evidence here shows that there was no genuine issue of material fact as to whether the natural gas was properly odorized under the federal regulatory standard and that there was no duty to warn of odor fade, Indiana Gas was entitled to judgment as a matter of law. The trial court did not err when it granted summary judgment in favor of Indiana Gas.

[36] Affirmed.

May, J. and Altice, J., concur.

ATTORNEYS FOR APPELLANT

Ashton Rose Smith
Emily A. DeVuono
Moore Law Group, PLLC
Louisville, Kentucky


ATTORNEYS FOR APPELLEE

Thomas J. Costakis
Libby Yin Goodknight
Hilary K. Leighty
Krieg DeVault LLP
Indianapolis, Indiana

Blake P. Holler
Krieg DeVault LLP
Carmel, Indiana